The CITY OF HILDALE, Plaintiff, Appellant, and Cross–Appellee,

v.

Gherri Bateman COOKE; Barbara Andrae Hall; Grant Dennis Beatty; KBGD, Inc., a Utah corporation; Bill Lewis, trustee of W.H.R. Trust; and Academy Title Co., Defendants, Appellees, and Cross–Appellants.

Nos. 990933, 990975.

Supreme Court of Utah.

June 29, 2001.

Ronald W. Thompson, Stephen H. Urquhart, St. George, for plaintiff.

Jim R. Scarth, Harold J. Dent, Jr., St. George, for defendants.

RUSSON, Associate Chief Justice:

¶ 1 The City of Hildale appeals from a trial court judgment awarding landowners Gherri Bateman Cooke and Barbara Andrae Hall damages pursuant to section 78–34–10 of the Utah Code for the condemnation of their property. We reverse and remand.

## BACKGROUND

¶ 2 Seeking to erect a 69–kilovolt electrical transmission line, the City of Hildale ("City" or "Hildale") instituted a condemnation proceeding on May 31, 1995, to obtain perpetual easements and rights-of-way on the respective properties of Gherri Cooke and Barbara Hall, defendants and appellees in the instant case (collectively, "landowners" or "defendants"). Subsequently, on January 12, 1996, the Fifth District Court for Washington

County entered an order of immediate occupancy, creating the easements sought by the City.

¶3 Three years later, on April 26, 1999, the district court commenced a two-day jury trial to determine what damages the City owed the landowners for the imposition of the easements on their properties. On the morning of the first day of trial, the City filed a motion in limine attempting to restrict testimony concerning, among other things, severance damages,[1] a proposed subdivision on Gherri Cooke's land, and archaeological evidence about Anasazi ruins on the landowners' properties. The district court conducted a hearing to consider the issues raised by Hildale and then partially denied the City's motion. The court ruled that severance damages were "still ... an open issue in the case"; that Gherri Cooke and her ex-husband, Claude Seth Cooke, could testify as to the planned subdivision on their property; and that it would not reach a decision on the admissibility of evidence regarding Anasazi ruins on the condemned lands until later in the trial. As to the proposed subdivision evidence, however, the court held that any testimony presented to establish the Cookes' plans of developing a subdivision must be limited to the highest and best use of their land. The court ruled from the bench:

> The court will ... allow Mr. Cooke to testify as to his opinion, as a former owner, of the highest and best use of the property and the reasons for his opinion to the extent that he may explain that he was pursuing ... the development of a subdivision. But he will be required to explain ... what he had done about developing a subdivision, again, only on the point of the highest and best use of the property.
>
> I think it would be misleading to the jury to disallow that kind of testimony if

there was at least something being done showing that someone had an opinion that residential development was the highest and best use and someone who is directly involved in the property....

> [As a result,] I would intend that [the Cookes] can tell [the jury] what [they] did and what approvals, if any, [they] had, and the extent to which [they] had undertaken this development—but only as it relates to what is the highest and best use. [T]hat will also be subject to cross-examination, of course.

¶4 Following the district court's ruling on the City's motion in limine, the landowners began presenting evidence.[2] Defendants first called Daniel Johnson, an expert appraiser. Mr. Johnson testified to the value of the land condemned on each of the properties, whether either of the properties suffered severance damages, and the highest and best use of each of the properties. Specifically, Mr. Johnson estimated that the value of the easement imposed on Gherri Cooke's land was $2600, and that the easement on Barbara Hall's property was worth $800. Mr. Johnson further opined that neither of the landowners' properties suffered severance damages as a result of the City's condemnation, and he asserted that the highest and best use of both properties was "long [term] investment purposes."

¶5 Barbara Wallen Frank, an archaeologist, was called to testify as to her findings of Anasazi ruins on the lands affected by Hildale's easement. Ms. Frank stated that she had discovered five sites "located along the easement corridor" that likely contained remnants of Virgin Anasazi civilization. Of those five sites, Ms. Frank testified that three were located on Merlin Webb's property,[3] that one was on Barbara Hall's land, and that she

---

1. Severance damages may occur where a partial taking to a parcel of land causes harm to the portion of the property not condemned. *See* Utah Code Ann. § 78–34–10(2) (1996).

2. Although landowners are the defendants in condemnation proceedings, it is proper for the defense to lead out because " 'the defendant ... has the burden of proof as to compensation.' " *Utah Dep't of Transp. v. Rayco Corp.*, 599 P.2d 481, 492 (Utah 1979) (quoting 7 James Wm.

Moore et al., *Moore's Federal Practice* § 71A.20[3] (2d ed.1971)).

3. Mr. Webb was a party to the suit underlying this appeal, but pursuant to Utah Rule of Appellate Procedure 37(b) (voluntary dismissal), we dismissed the appeal of the judgment as to Merlin Webb in an order dated May 2, 2000. Accordingly, Mr. Webb is no longer a party to this appeal.

"believe[d]" the final site was also located on Mr. Webb's property.

¶ 6 Next, the landowners testified concerning their respective properties. Gherri Cooke opined that the value of her land taken by Hildale was $5800, and that the taking caused $110,880 in damages to the remainder of her property. When asked how the remainder of her property had been damaged, Ms. Cooke responded:

> Several ways. If you look at the plan that we had for the subdivision, it would take an easement across the five front lots, as Claude already pointed out. And the total taking of the easement was .5 acres, which would eliminate at least one lot out of the subdivision, even if the rest were undesirable lots and we did re-do the plat. But I can't see that anyone wants to build a house facing the highway that has a 25–foot easement. It's just not very desirable.

In discussing the planned subdivision further, Ms. Cooke described various activities she had engaged in to prepare her property for the development.

¶ 7 The defense also called Claude Cooke[4] to the stand, where he stated that in his opinion the City's easement on Gherri Cooke's land was worth $10,000 and that it had caused $160,000 in severance damages. Mr. Cooke further noted that he believed the highest and best use of the land to be "residential." In support of this view, Mr. Cooke outlined a number of steps he had taken to realize his and Gherri's plan to develop a subdivision on the property. On direct examination, he elaborated:

> The first step was to go to the county and see what their requirements [for developing a subdivision] were.... The next thing I did was applied [to the state] for a well permit[, which I received. Then] I went and had the well drilled to see if there was water down at the bottom of the hole[, but] I didn't own enough water to supply the twelve lots that was our plan [for the] subdivision. And so I ... purchase[d] water to supply these lots....

> [After that,] I had the surveyors come out and draw up a plot plan of the subdivision. [I ran the pipe from the lots] up to the water tank, which is the highest point of the subdivision. And then from there I had to put a six-inch line out of the tank across the wash and over to the rest of the subdivision....

> While this was going on, I had roads ... put in rough. The county requires that you have six inches of road base on ... your streets. So I had twenty-five 22–yard loads of [gravel road base] hauled in from Hurricane.... I purchased two [fire hydrants, but] I only put in one.... Then I ... hire[d] the blade to come back and spread out all the [gravel road base].

> I had to have a proof map done proving up on the water. And in order to have the water secured from the state, you have to be using that water.... [So I] made a reservoir and clay lined the inside of the reservoir. I [planted] six acres of alfalfa ... and a bunch of [shade] trees ... to prove up on the water.... And we had to have [water percolation] tests and soil analys[e]s done on the lots on the subdivision. [The state health department certified that we had passed the percolation and soil tests, so I sought] permission from the state [to access the highway from the subdivision]. But they made requirements that I put in cattle guards and put in culverts for drainage, so [I] put in two 50–foot culverts....

> [Then] I had ... UP & L come out and put in the power line. They put in 1219 feet of power line on the subdivision. They put in five poles. We had to pay for that.

¶ 8 Finally, concluding its examination of the affected landowners, the defense called Barbara Hall. Ms. Hall explained that, in line with Mr. Cooke's testimony, she believed the highest and best use of her land to be "residential." Specifically, Ms. Hall testified that like the Cookes, she had intended to build a subdivision on her property as "an extension

---

**4.** Claude Cooke was a joint owner of the Cooke property at the time of the taking. However, subsequent to the City's condemnation of her land, the Cookes divorced and Gherri Cooke assumed all ownership rights in the property.

of [the Cookes' development] after they had finished theirs up and I [had] gotten some money together." She stated, "We were going to build ... another addition there on my property with—well, Claude had the equipment and things and the know how, and I had the property and friendly manner." Accordingly, she opined that the value of her land taken by the City was $7000. Ms. Hall also estimated that the City's condemnation of her land caused $75,000 in severance damages.

¶ 9 At the close of the landowners' case in chief, the City called its own witnesses to testify to the value of the lands at issue. Hildale first called Stanford McConkie, an expert appraiser. Mr. McConkie stated that he had calculated the value of defendants' lands by determining the prices of comparable sales in the surrounding area. In accordance with this analysis, Mr. McConkie concluded that for its condemnation of their lands the City owed Gherri Cooke $1740 and Barbara Hall $550. Mr. McConkie further testified that severance damages resulting from the City's condemnation were "nonexistent." Moreover, Mr. McConkie noted that since he believed there was "no market demand" for residential development in the area immediately surrounding defendants' properties, the highest and best use of their lands was "speculative holding ... in anticipation of some future development."

¶ 10 Following Mr. McConkie's testimony, the City called the final witness in the case, Dale Jackman, also an expert appraiser. Mr. Jackman testified that the City's easement had caused no severance damages to defendants' properties. Additionally, Mr. Jackman opined that the highest and best use of the properties at the time of the condemnation was "holding for investment." Echoing Mr. McConkie's concerns about market demand for residential property in the area, Mr. Jackman explained, "Since 1995, very few subdivisions [in the area at issue] have been able to have a positive cash flow. There have been a lot of them built. There

have been very few sales.... And so in order to say the highest and best use of this property, you can say [it] is possible subdivision, but it isn't in this area, it isn't in the foreseeable future."

¶ 11 At the conclusion of the trial, the jury returned a special verdict awarding damages to each of the landowners. The jury awarded Gherri Cooke $1740 for the value of her condemned land and $65,000 in severance damages occurring as a result of the condemnation, and Barbara Hall $1809 in compensation for the easement imposed on her property and $15,000 in severance damages.

¶ 12 Subsequently, Hildale moved pursuant to Utah Rule of Civil Procedure 59(a) [5] to set aside the severance damages awarded Gherri Cooke and Barbara Hall or, in the alternative, for a new trial. The basis of the City's motion was that the verdict as to severance damages was unsupported by the evidence, and that it had been rendered under influence of passion and prejudice. Defendants responded, and the trial court denied the motion in a written ruling dated August 3, 1999. The court noted that the landowners' testimony supported the severance damage verdict, that the jury had been instructed to consider the landowners' "self interest as well as their qualifications," and that the jury was properly allowed to award severance damages based on the landowners' testimony if it "had enough confidence in that testimony ... despite the opinions of the experts." Consequently, ruled the court, "because it does not appear that the jury acted improperly in awarding severance damages, the [c]ourt can find no basis upon which to order a new trial in this matter."

¶ 13 On September 9, 1999, the court held a hearing on the calculation of interest for the jury award and issued an order ruling that "[t]he interest on the damages awarded should be calculated at eight percent per annum, simple interest, from January 12, 1996 to the date of this Order...." Shortly

---

5. Utah Rule of Civil Procedure 59(a) allows a trial judge to grant a new trial or modify a judgment upon determining that the verdict included "[e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice." Utah R.Civ.P. 59(a)(5). The rule further allows the judge to so act where it is determined there was an "[i]nsufficiency of the evidence to justify the verdict or other decision, or that it is against law." Id. 59(a)(6).

thereafter, on October 18, 1999, the trial court entered judgment on the verdict.

¶ 14 Hildale now appeals the trial court's denial of its motion to set aside the severance damages or, in the alternative, for a new trial.

### ANALYSIS

¶ 15 On appeal, Hildale raises four arguments: (1) that the trial court erred by allowing the Cookes' testimony that the highest and best use of Gherri Cooke's land was as a residential subdivision development; (2) that the trial court abused its discretion by refusing to set aside the severance damage awards as unsupported by the evidence since all the experts in the case testified that Hildale's condemnation created no severance damages on the landowners' property; (3) that the trial court erred by refusing to set aside the severance award as given under the influence of passion and prejudice; and (4) that the trial court erred by permitting Barbara Frank's testimony concerning Anasazi ruins on the property of Barbara Hall. In addition, the landowners cross-appeal the trial court's September 9, 1999, order ruling that interest paid on the jury award must be based on simple interest.

### I. HIGHEST AND BEST USE

#### A. Waiver

■■■ ¶ 16 The landowners raise as a preliminary matter the issue of whether Hildale waived its right to appeal the district court's admission of the Cookes' highest and best use testimony by failing to object to that testimony at trial following the court's evidentiary ruling. See Utah R.Evid. 103(a). While the landowners correctly state the general rule that "failure to make either a contemporaneous objection or some specific preservation of a claim of error ... whe[n] a pretrial motion to suppress ha[s] been made and denied" waives that objection's appealability, *Franklin v. Stevenson*, 1999 UT 61, ¶ 23, 987 P.2d 22; *see also State v. Lesley*, 672 P.2d 79, 82 (Utah 1983), we have carved a distinct exception to this blanket principle. In cases where "the trial judge is also the judge who ruled on the pretrial motion and

where the record or transcript indicates that an evidentiary hearing was held," a party need not "renew [that] motion" in order to preserve the issue for appeal. *State v. Johnson*, 748 P.2d 1069, 1071 (Utah 1987); *see also State v. Dibello*, 780 P.2d 1221, 1229 n. 9 (Utah 1989); *State v. Mitchell*, 779 P.2d 1116, 1119 n. 4 (Utah 1989); *State v. Bruce*, 779 P.2d 646, 649 (Utah 1989). Here, not only was the trial judge the same judge who ruled on the City's motion in limine during the April 26, 1999, evidentiary hearing, but the hearing occurred after the trial had already begun—and just minutes before the landowners began presenting their evidence. Accordingly, we find the landowners' contention that Hildale did not preserve for appeal its objection to the Cookes' testimony to be plainly without merit.

#### B. Landowner Testimony as to Highest and Best Use

¶ 17 Having determined that Hildale did not waive its right to appeal the admissibility of the Cookes' highest and best use testimony, we now address the merits of the City's argument that the trial court erred by allowing the Cookes to testify to highest and best use.

¶ 18 Municipalities in Utah have long had authority to exercise the power of eminent domain. *See* Utah Const. art. XI, § 5. At the same time, however, that authority is constrained both constitutionally and statutorily. Article I, section 22 of the Utah Constitution states, "Private property shall not be taken or damaged for public use without just compensation." In awarding "just compensation" to landowners who have had their property condemned, section 78–34–10 of the Utah Code provides:

The court, jury[,] or referee ... must ascertain and assess:

(1) the value of the property sought to be condemned ... ; [and]

(2) if the property sought to be condemned constitutes only a part of a larger parcel, the damages [that] will accrue to the portion not sought to be condemned by

reason of its severance from the portion sought to be condemned....

Utah Code Ann. § 78–34–10 (1996).

¶ 19 "Just compensation means that the owners must be put in as good a position money wise as they would have occupied had their property not been taken." *State v. Noble*, 6 Utah 2d 40, 43, 305 P.2d 495, 497 (1957). In other words,

> The measure of damages [in a condemnation case] is ... the market value of the property.... The accepted formula for determining fair market value is not how much would the property produce over a period of fifteen years, but what would a purchaser willing to buy but not required to do so, pay and what would a seller willing to sell but not required to do so, ask.

*Noble*, 6 Utah 2d at 44, 305 P.2d at 498; *see also Sigurd City v. State*, 105 Utah 278, 289, 142 P.2d 154, 159 (1943).

¶ 20 Likewise, in cases where a partial taking results in severance damages by affecting the remainder of the property, ascertaining the market value of the property is also necessary. As we noted in *Salt Lake County Cottonwood Sanitary District v. Toone*, "The cardinal and well-recognized rule as to the measure of damages to property not actually taken but affected by condemnation is the difference in market value of the property before and after the taking." 11 Utah 2d 232, 234, 357 P.2d 486, 488 (1960); *see also State ex rel. Rd. Comm'n v. Peterson*, 12 Utah 2d 317, 321, 366 P.2d 76, 79 (1961) (holding that "the correct measure" of severance damages is "the difference between its fair cash market value before and after the taking").

¶ 21 Accordingly, the time at which the market value of a condemned land is assessed becomes crucial to properly measuring just compensation. Section 78–34–11 of the Utah Code mandates, "For the purpose of assessing compensation and damages, the right thereto shall be deemed to have accrued at the date of the service of summons, and its actual value at that date shall be the measure of compensation ... as provided in Section 78–34–10." Indeed, we have stated that the appropriate measure of damages is not simply the market value of the land condemned but the market value at the time it was condemned: "[T]he measure of compensation of land actually taken is the market value of the land on that date, no more and no less." *State ex rel. Rd. Comm'n v. Bettilyon's, Inc.*, 17 Utah 2d 135, 137, 405 P.2d 420, 422 (1965), *cert. denied*, 382 U.S. 1010, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966).

¶ 22 The requirement that the value of condemned land be assessed "at the date of the service of summons" does not mean that just compensation is calculated by taking a temporal snapshot of the land's value according to its use at that time. Rather, the value of condemned property is based on the "highest and best use to which it could be put at the time of the taking, without limitation as to the use then actually made of it." *State ex rel. Rd. Comm'n v. Jacobs*, 16 Utah 2d 167, 170, 397 P.2d 463, 464 (1964); *see also State ex rel. Rd. Comm'n v. Wood*, 22 Utah 2d 317, 320, 452 P.2d 872, 873 (1969); *Moyle v. Salt Lake City*, 111 Utah 201, 212, 176 P.2d 882, 888 (1947). The reason for this is, if the damages for a taking are to be appraised on the basis of the actual value at the date of summons, "consideration must be given to all factors bearing upon such value that a prudent and willing buyer and seller, with knowledge of the facts, would take into account, including any potential development" that could be performed on the property. *Wood*, 22 Utah 2d at 319, 452 P.2d at 873.

¶ 23 However, totally conjectural or speculative potential uses may not be considered when determining the highest and best use of a property, for a determination of highest and best use must reflect only "potential development [that] *could with reasonable certainty be expected* with respect to the property." *Id.* (emphasis added). Such developments, moreover, "must not be merely in the realm of speculation because the land is adaptable to a particular use in the remote and uncertain future." *Jacobs*, 16 Utah 2d at 170, 397 P.2d at 464. In other words, a property's highest and best use includes only those uses that are feasible, not those that are merely possible. *Id.*

¶ 24 To prove that a potential use of a property is feasible, three specific elements must be established. First, it must be demonstrated that the use is physically feasible—that the land is physically suited or adaptable to the potential use. *See, e.g., Kennecott Copper Corp. v. Salt Lake County*, 122 Utah 431, 433, 436, 250 P.2d 938, 939–40 (1952) (finding that the current use of a property as a copper tailings dump was its highest and best use because the "tailings ha[d] become a part of the ground where they [we]re dumped and ha[d] completely destroyed the value of the ground for grazing purposes"). Second, it must be established that the use is legally feasible—that the land is legally available for the potential use, or that any legal restrictions currently preventing the potential use have a reasonable probability of being modified so that they no longer pose a barrier. *See Redevelopment Agency v. Barrutia*, 526 P.2d 47, 48 (Utah 1974) (indicating that a property's highest and best use was for commercial purposes because "it was so zoned"); *Jacobs*, 16 Utah 2d at 170–71, 397 P.2d at 465 (recognizing that where " 'there is a possibility or probability that the zoning restriction may in the near future be repealed or amended so as to permit the use in question, such likelihood may be considered if the prospect of such repeal or amendment is sufficiently likely as to have an appreciable influence upon present market value' " (emphasis omitted) (quoting 4 *Nichols on Eminent Domain* § 12,322(1))). Finally, it must be proven that the potential use is economically feasible—that there is sufficient demand for the potential use. *See State ex rel. Rd. Comm'n v. Hopkins*, 29 Utah 2d 131, 133–34, 506 P.2d 57, 58–59 (1973) (ruling that the trial court had not erred by admitting evidence of a proposed subdivision where such a use would have comported with existing zoning and evidence had been admitted that "75 homes per year" had been sold in the area "for the past three years"); *State ex rel. Eng'g Comm'n v. Tedesco*, 4 Utah 2d 248, 250, 251, 291 P.2d 1028, 1029 (1956) (holding that the trial court erred by failing to exclude

from evidence the market value testimony of experts who had assumed without basis "that there was a willing seller of 62 lots who had 62 present willing buyers, with nothing left to do but deliver an ownership document").[6] *See generally* Allan T. Brinkerhoff, Note, *Eminent Domain: Proving Highest and Best Use of Undeveloped Land in Utah*, 1973 Utah L.Rev. 705, 707–13.

¶ 25 While landowners may testify as to a proposed use they may have for the land different than the use for which it is employed at the time of the taking, and that such proposed use is not entirely conjectural or speculative, including their own foundational testimony establishing what steps have been taken to realize a transformation in use of their property, *see, e.g., Utah Dep't of Transp. v. Jones*, 694 P.2d 1031, 1036 (Utah 1984); *Jacobs*, 16 Utah 2d at 170–71, 397 P.2d at 465, they may not testify to the highest and best use of the property itself unless a foundation is laid establishing their expertise. As we stated in *Jones*:

> Admission of any type of testimony requires the laying of proper foundation to qualify the witness to give the particular testimony sought to be elicited. No foundation was laid or sought to be laid regarding Jones' qualifications to testify regarding "the highest and best use" of the subject property. "Highest and best use" is a term of art in eminent domain proceedings. Testimony regarding it must come from properly qualified experts. Jones' ownership of the land alone would not qualify him to give such an opinion.

694 P.2d at 1036. In short, a landowner may testify concerning the individual elements of feasibility, but that landowner must offer the testimony of a properly qualified expert to prove the actual feasibility of a potential use.

### C. The Landowners' Testimony

¶ 26 In this case, the trial court ruled in response to Hildale's motion in limine that Claude Cooke could testify to highest and best use of the land because of his

---

6. Hildale argues *Tedesco* stands for the proposition that a subdivision that "does not legally exist and presents no entitlement" should never be considered by a jury charged with determining just compensation. However, as explained above, this reading of *Tedesco* is as inconsistent with the actual holding of that case as it is with our other highest and best use decisions.

status as a former landowner. The court stated,

> The court will ... allow Mr. Cooke to testify as to his opinion, as a former owner, of the highest and best use of the property and the reasons for his opinion....
>
> I think it would be misleading to the jury to disallow that kind of testimony if there was at least something being done showing that someone had an opinion that residential development was the highest and best use and someone who is directly involved in the property.

As a result, Mr. Cooke opined that the highest and best use of the land at issue was "residential," and then testified at length concerning what steps he and Ms. Cooke had taken to establish a subdivision on the property. The landowners never moved to have Mr. Cooke qualified as an expert, and the court never qualified him as such.

¶ 27 Consequently, the court should have excluded Mr. Cooke's opinion of the highest and best use of the property. Mr. Cooke's opinion that the land's highest and best use was "residential" directly conflicted with the opinion of those witnesses who were qualified by the court as experts. The City's two experts, Dale Jackman and Stanford McConkie, testified that the land's highest and best use was, respectively, "holding for investment" and "speculative holding." The landowners' own witness, Daniel Johnson, similarly testified that the property's highest and best use was "long [term] investment purposes." Therefore, Mr. Cooke's opinion of the highest and best use of the land as residential was improper and should have been excluded under *Jones. See id.*

▮ ¶ 28 Likewise, because of its intrinsic tie to Mr. Cooke's improper highest and best use opinion, both Claude and Gherri Cookes' testimony regarding what steps they took to develop their subdivision should have been excluded from evidence. If offered only to prove the value of the land, this evidence may have been admissible to establish a higher per acre value for the property on the basis of improvements, such as the construction of roads or installation of fire hydrants and electrical lines. *See, e.g., Bd. of County Comm'rs v. Ferrebee,* 844 P.2d 308, 311–12

(Utah 1992). Similarly, had the Cookes presented expert testimony establishing that the highest and best use of their property was residential, their testimony would have been admissible to remove the proposed subdivision from the realm of the conjectural and speculative and demonstrate its feasibility. *See, e.g., id.; Jacobs,* 16 Utah 2d at 170–71, 397 P.2d at 465. To this degree, the Cookes' statements about how they secured water rights, dug wells, conducted soil and water analyses, and otherwise prepared the land for their planned subdivision would have helped establish that the land was physically ready for such a development, and that they were in the process of obtaining the legal permissions needed to proceed. But the Cookes did not offer their testimony to show the value of improvements to the land, and they presented no expert opinion that the highest and best use of their property was residential. In the absence of such an expert opinion, the trial court should have excluded the Cookes' testimony outlining the steps they had taken to develop their subdivision. *See Jones,* 694 P.2d at 1036.

▮ ¶ 29 In the same regard, although not challenged on appeal, Barbara Hall's highest and best use opinion should have been excluded along with the Cookes' testimony. Like Claude Cooke, Ms. Hall testified in contradiction to the expert witnesses that the highest and best use of her land was "residential"—without ever having been qualified as an expert herself as required by *Jones.* Importantly, Ms. Hall based this opinion on the Cookes' testimony, which we have already determined should have been excluded by the trial court. When asked how she formed her opinion that the highest and best use of her land was residential, Ms. Hall stated, "Well, a couple of things. Mostly, we have mentioned briefly, you know, the Cookes' development." Accordingly, because she explicitly founded her opinion of her land's highest and best use on the inadmissible testimony of the Cookes, Barbara Hall's statement to this extent was covered by the City's motion in limine and the trial court's ruling thereon, and thus was erroneously admitted under *Jones.* Indeed, Ms. Hall explained that she planned to construct a

"larger" subdivision on her property as "an extension" of the Cookes' development "after they had finished theirs up and I[had] gotten some money together."

¶ 30 However, while we find that the trial court erred in admitting the Cookes' highest and best use testimony, along with Barbara Hall's opinion of the highest and best use of her land, a finding of error by itself does not command reversal. We reverse a trial court's judgment for the improper admission of evidence only where the court's erroneous ruling "was prejudicial," *Downey State Bank v. Major–Blakeney Corp.*, 578 P.2d 1286, 1288 (Utah 1978), *overruled in part on other grounds by Mgmt. Servs. Corp. v. Dev. Assocs.*, 617 P.2d 406 (Utah 1980), "affected the substantial rights of a party," *Kelson v. Salt Lake County*, 784 P.2d 1152, 1157 (Utah 1989), or was otherwise "harmful." *State v. Villarreal*, 889 P.2d 419, 425 (Utah 1995); *see also* Utah R.Evid. 103(a). For an error to be harmful, "the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict." *State v. Knight*, 734 P.2d 913, 920 (Utah 1987); *see also Harline v. Barker*, 912 P.2d 433, 442 (Utah 1996).

¶ 31 Here, the trial court's erroneous admission of the landowners' highest and best use testimony directly undermines confidence in the verdict. Specifically, the trial court's error prejudiced Hildale by presenting the jury with an impermissible and inadmissible basis on which to assess the value of Gherri Cooke's and Barbara Hall's land and, thus, any severance damages the City might have owed these defendants. Because severance damages are measured by the "difference in market value of the property before and after the taking," *Salt Lake County Cottonwood Sanitary Dist. v. Toone*, 11 Utah 2d 232, 234, 357 P.2d 486, 488 (1960), and the market value of condemned property is based on the "highest and best use to which it could be put at the time of the taking," *Jacobs*, 16 Utah 2d at 170, 397 P.2d at 464, the trial court's erroneous admission of Claude Cooke's and Barbara Hall's highest and best use opinions tainted the verdict by allowing the jury to consider severance damage estimates clearly premised upon the as-

sumption that the highest and best use of the respective properties was "residential."

¶ 32 In fact, Claude Cooke expressly testified that his highest and best use opinion impacted his estimate of severance damages. When asked how severance damages were created on Gherri Cooke's land, Mr. Cooke responded, "[The condemnation] left ... raw land instead of residential land." When the landowners' attorney then queried further as to the cause of severance damages, Mr. Cooke clarified: "Because it wasn't cost effective to do a subdivision anymore." Similarly, when Gherri Cooke was asked how she arrived at her severance damage estimate, she explained that her estimate was made in reliance on Mr. Cooke's assertion that the highest and best use of her land was for residential purposes. She stated that the easement harmed the remainder of her property in "[s]everal ways":

> If you look at the plan that we had for the subdivision, it would take an easement across the five front lots, as Claude already pointed out. And the total taking of the easement was .5 acres, which would eliminate at least one lot out of the subdivision. . . .

Barbara Hall likewise testified that her estimate of severance damages was premised on the assumption that the land's highest and best use was residential. The landowners' attorney asked Ms. Hall why she believed the remainder of her property had suffered severance damages, and she stated, "The one thing I mentioned was the fact that the Cookes and I had a plan for a future. . . ."

¶ 33 As a result, had the trial court properly excluded the landowners' highest and best use testimony under *Jones,* it would have excluded the basis and foundation for the severance damage estimates of Claude Cooke, Gherri Cooke, and Barbara Hall. These estimates provided the only support for, respectively, the $65,000 severance damage verdict awarded to Gherri Cooke and the $15,000 severance award rendered as to Barbara Hall. In other words, had the trial court properly excluded the evidence, the jury would have had no ground on which to find severance damages on Gherri Cooke's and Barbara Hall's properties based on the as-

sumption that the highest and best use of their land was for residential purposes. *See Cal Wadsworth Constr. v. City of St. George,* 898 P.2d 1372, 1378–79 (Utah 1995) ("An error is harmful if it is reasonably likely that the error affected the outcome of the proceedings."). In view of the far-reaching impact Mr. Cooke's and Ms. Hall's highest and best use opinion had on the verdict, we hold that the trial court's erroneous admission of their opinions harmed Hildale to such an extent that "the likelihood of a different outcome" in this case is "sufficiently high to undermine confidence in the verdict." *State v. Knight,* 734 P.2d 913, 920 (Utah 1987).

¶ 34 Accordingly, we reverse the judgment of the district court and remand for a new trial. Moreover, because the court's erroneous admission of the landowners' highest and best use testimony is dispositive of the case on appeal, we do not address the City's arguments that the trial court erred in denying Hildale's motion for a new trial, or that the court erred by admitting the archaeological testimony of Barbara Frank. However, because the issue will necessarily be implicated on remand, we will address the landowners' cross-appeal of the trial court's prejudgment interest ruling.

## II. INTEREST

¶ 35 The landowners assert on cross-appeal that the trial court erred in its post-trial order by ruling prejudgment interest on the award to be calculated simply rather than compounded annually.[7] We hold that the trial court properly ordered the prejudgment interest in this case to be calculated simply.

¶ 36 Section 78–34–9 of the Utah Code governs awards of prejudgment interest in condemnation actions. Specifically, the statute requires that condemnation

> judgment[s] shall include, as part of the just compensation awarded, interest at the

rate of 8% per annum on the amount finally awarded as the value of the property and damages, from the date of taking ... or [from the date of the] order of occupancy, whichever is earlier, to the date of judgment.

Utah Code Ann. § 78–34–9 (1996). When interpreting statutes, we look first to the plain language of the act to determine its meaning. *E.g., Hall v. Utah State Dep't of Corrections,* 2001 UT 34 ¶ 15, 24 P.3d 958; *Jensen v. Intermountain Health Care, Inc.,* 679 P.2d 903, 906 (Utah 1984). By its own terms, the language of section 78–34–9 states that interest should be awarded at a rate of "8% per annum," not "8% per annum, compounded annually." Moreover, we have previously held that "[c]ompound interest is not favored by the law" and that, accordingly, interest on a judgment should be calculated simply unless agreed to otherwise by the parties. *Watkins & Faber v. Whiteley,* 592 P.2d 613, 616 (Utah 1979). "Those asking us to overturn prior precedent have a substantial burden of persuasion. This burden is mandated by the doctrine of stare decisis." *State v. Menzies,* 889 P.2d 393, 398 (Utah 1994) (citation omitted). Specifically, parties seeking to have us depart from our prior case law must " 'clearly convince[] [us] that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.' " *Id.* at 399 (quoting John Hanna, *The Role of Precedent in Judicial Decision,* 2 Vill.L.Rev. 367, 367 (1957)). Here, the landowners' assertion that "[r]ecent financial maturational evolution of the economic rules of the great experiment has taught us that the old rules of determining interest are obsolete," offered with little support and no analysis, does not even approach the high bar required to override stare decisis. Therefore, we rule that the trial court did not err by ordering the land-

---

7. The landowners also argue that even if the trial court did not err by ordering prejudgment interest to be calculated simply pursuant to section 78–34–9 of the Utah Code, that statutory provision is unconstitutional as impermissibly conflicting with the Utah Constitution's guarantee against the taking of private property for public use without just compensation. *See* Utah Const. art. I, § 22. We decline to address this issue. It was raised for the first time in a reply to a reply brief. Utah R.App.P. 24(g). Moreover, it was not adequately briefed, researched, or presented. *See, e.g., Ellis v. Swensen,* 2000 UT 101, ¶ 17, 16 P.3d 1233; *State v. Thomas,* 961 P.2d 299, 304 (Utah 1998); *State v. Herrera,* 895 P.2d 359, 368 n. 5 (Utah 1995).

owners' prejudgment interest to be calculated simply. In doing so, the court correctly interpreted the relevant statutory provision and properly followed our previous determination that the law disfavors compound interest.

## CONCLUSION

¶ 37 We conclude that the trial court erred by allowing the Cookes' and Barbara Hall's highest and best use testimony to be admitted into evidence. This error prejudiced Hildale as to the verdicts for Gherri Cooke and Barbara Hall. Therefore, we reverse the judgment of the district court and remand for a new trial consistent with this opinion. We further hold, however, that the trial court did not err by ordering prejudgment interest to be calculated simply rather than compounded annually. Prejudgment interest in this and other condemnation cases is to be calculated based on simple interest.

¶ 38 Chief Justice HOWE, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Associate Chief Justice RUSSON's opinion.