**2018 UT App 221**

# THE UTAH COURT OF APPEALS

ROCKY MOUNTAIN POWER INC.,
Appellee and Cross-appellant,

*v.*

RANDY E. MARRIOTT, EDGE HOLDINGS LLC,
WILLARD LAND HOLDINGS LLC, R&K PROPERTIES LC,
WESTSIDE INVESTMENTS LC, AND KAMI F. MARRIOTT,
Appellants and Cross-appellees.

Opinion
No. 20160956-CA
Filed November 29, 2018

First District Court, Brigham City Department
The Honorable Brandon J. Maynard
No. 090100270

Robert E. Mansfield, Steven J. Joffee, Megan E.
Garrett, and Gregory H. Gunn, Attorneys for
Appellants and Cross-appellees

D. Matthew Moscon, Cameron L. Sabin, and R. Chad
Pugh, Attorneys for Appellee and Cross-appellant

JUDGE KATE A. TOOMEY authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

TOOMEY, Judge:

¶1   This appeal stems from Rocky Mountain Power's (Rocky
Mountain) condemnation to obtain easements across Randy E.
Marriott's (Marriott)[1] property. Marriott appeals, arguing that

---

1. The appellants include Randy E. Marriott, Kami F. Marriott,
Edge Holdings LLC, Willard Land Holdings LLC, Westside
Investments LC, and R&K Properties LC. For the reader's
convenience, we refer to them collectively as "Marriott."

the district court erred in excluding evidence of damages resulting from the easements' interference with potential mining. Rocky Mountain cross-appeals, asserting that the district court erred in granting Marriott partial summary judgment on a provision in Rocky Mountain's amended condemnation complaint. We affirm the district court's grant of partial summary judgment to Marriott. But we reverse the district court's ruling that excluded evidence of damages resulting from lost potential mining and remand to that court for further proceedings consistent with this opinion.

BACKGROUND

¶2     Seeking to construct an electric transmission line (the New Line), Rocky Mountain filed a complaint for condemnation to obtain easements across approximately 453 acres of land (the Property) belonging to Marriott. Soon after, the parties stipulated to Rocky Mountain's occupancy of the easements, and Rocky Mountain began construction on the New Line. Marriott then requested that a jury determine the appropriate amount of "just compensation."

¶3     At the time of the condemnation, Marriott possessed two small mining permits, which authorized him to mine for sand and gravel aggregate on a ten-acre portion of the Property. Although the mining operation was relatively small, Marriott had applied for a large mining permit from the Division of Oil, Gas and Mining (DOGM). In the application (the Proposed Permit), Marriott provided plans to mine 145 acres of the Property in two phases. Phase one consisted of 35 acres, and phase two consisted of 110 acres. The Proposed Permit estimated that it would take "between 8 and 15 years" to complete phase one and did not include a time frame for phase two. DOGM had indicated to Marriott that the Proposed Permit would be approved.

¶4 To support his proposed "just compensation," Marriott provided evidence of the market value of the land supporting the New Line. That evidence included lost value because of the New Line's interference with potential mining on the Property. Marriott asserted that the New Line "greatly diminishes the ability to mine gravel products not only directly beneath the [New Line] . . . but also the areas surrounding [it]." Although the land supporting the New Line was not included in the Proposed Permit, Marriott asserted that he planned to eventually exploit "all mineable areas of the [P]roperty." Accordingly, Marriott argued that the loss of potential mining should be included in his award of just compensation.

¶5 Rocky Mountain disagreed with Marriott's proposed damages. It asserted that damages should be based solely on uses to which the Property could have been put at the time of the condemnation. Rocky Mountain pointed to various preexisting encumbrances on the Property, which created legal barriers to Marriott's proposed mining development. Given those legal barriers, Rocky Mountain believed that Marriott's alleged mining plans were speculative, and therefore the lost value of that potential mining should not be considered in determining Marriott's award of just compensation.

¶6 For example, the Property was bisected by an irrigation canal (the Canal), which the federal government owned in fee. Although Marriott conceded he did not have the unilateral right to relocate the Canal, he asserted that he always planned to move the Canal and believed a relocation was possible. Thus, Marriott included losses of potential mining that would have required the Canal's relocation.

¶7 Rocky Mountain attempted to avoid these potential damages by amending its condemnation complaint. It added a provision (the Canal Provision), which provided that, if Marriott received written approval from the federal government to

relocate the Canal, Marriott had the right to request that Rocky Mountain relocate portions of the New Line to allow mining operations on the Property. If that happened, Rocky Mountain would be obligated either to relocate the New Line at its own expense or pay Marriott "the fair market value of the Deposits that would otherwise be made accessible for mining by the relocation of the [New Line]."

¶8    In response to the amendment, Marriott filed a motion for partial summary judgment, asking the court to strike the Canal Provision. That motion first cited the Utah Code, stating that "damages shall be considered to have accrued at the date of the service of summons," *see* Utah Code Ann. § 78B-6-512(1) (LexisNexis 2012), and that the condemnor "shall, within 30 days after final judgment, pay the sum of the money assessed," *see id.* § 78B-6-514. Marriott then asserted that the Canal Provision was impermissible because it "propose[d] that some of the damages will only be calculated and paid in the future."

¶9    After reviewing the arguments, the district court granted Marriott's motion for partial summary judgment. It found that there were no disputes of material fact, and that the Canal Provision was "not permissible under Utah Law for the reasons stated in" Marriott's motion. The court therefore struck the Canal Provision from the condemnation complaint.

¶10   Apart from the Canal, two more preexisting encumbrances created legal barriers to potential mining on the Property. These encumbrances included a fifty-foot-wide easement owned by Rocky Mountain that contained an electric transmission line, and a thirty-foot-wide easement owned by Questar Gas that contained a natural gas pipeline (collectively, the Utility Lines). Marriott did not have the unilateral right to relocate the Utility Lines. The relocation process involved formal procedures, including the proposal of alternate routes and the payment of assessment fees. Further, whether to grant relocation

requests was within the discretion of Rocky Mountain and Questar, and their decisions were not subject to review or appeal. But Marriott nonetheless claimed he intended to relocate the Utility Lines to facilitate his mining plans. And he claimed damages for the lost value of potential mining that depended on their relocation.

¶11    Rocky Mountain opposed Marriott's proposed damages by filing two motions to exclude evidence (the Motions to Exclude). In the first motion, Rocky Mountain asked the court to exclude evidence of losses that depended on Marriott's ability to relocate the Utility Lines. That motion asserted that Marriott's "position that the Utility Lines . . . could be relocated is not a 'reasonable certainty.' It is fantasy." Rocky Mountain noted that Marriott has "no unilateral right to relocate the Utility Lines and never obtained consent from [Rocky Mountain] or Questar to relocate those lines." Further, Marriott had "never asked [Rocky Mountain] or Questar to move the Utility Lines or the Easements" and "it is impossible to know how that request would have been received." Before approving such a request, Rocky Mountain and Questar "would need to consider many factors, including . . . the proposed new locations and replacement routes of the easements, whether other third parties would have to approve the relocations and whether such approvals had been obtained, . . . the cost of relocating the lines and the future maintenance costs," etc. The first motion also noted that Rocky Mountain and Questar had complete discretion to grant or deny relocation requests. In sum, Rocky Mountain argued that the "hypothetical relocation of the [Utility Lines] . . . cannot be a factor in determining the amount of reasonable compensation to which [Marriott is] entitled."

¶12    In the second motion, Rocky Mountain asked the court to exclude evidence of losses that depended on Marriott's ability to obtain authorization to mine areas where mining was not permitted at the time of the condemnation. To support that

request, Rocky Mountain noted "it was impossible to know" whether DOGM would approve the Proposed Permit. Further, even if the Proposed Permit were approved, Marriott sought compensation for lost mining in areas the Proposed Permit would not cover. Rocky Mountain stated, "[Marriott's] claim that [he] would have received DOGM's approval to revise a non-existent mine permit is too speculative." Thus, it asked the district court to exclude evidence of damages from potential lost mining in areas that would be authorized only if the Proposed Permit was approved. In the alternative, it asked the court to exclude evidence of damages from lost mining in areas that were not covered by the Proposed Permit.

¶13 When Rocky Mountain filed the Motions to Exclude, the parties had not concluded fact discovery, and expert discovery had not begun. Fact discovery was scheduled to end the following month, initial expert disclosures were due approximately four months later, expert rebuttal reports were due approximately five months later, and the deadline for expert depositions was approximately six months later.

¶14 Marriott opposed the Motions to Exclude. In his memorandum in opposition, he noted that "just compensation" is not measured by the actual use of the property at the time of the condemnation, but rather by the property's highest and best use. Further, he argued that the district court could not yet properly determine whether it was feasible to remove the legal barriers that prevented mining on the Property. Such a determination "would require the [c]ourt to consider evidence and expert testimony relating to several factors," which Marriott intended to obtain and "submit . . . at the appropriate time." Essentially, Marriott asserted that granting the Motions to Exclude at that time would deny him "a full and fair opportunity to obtain or offer evidence" that supports or relates to his position.

¶15 The district court granted the Motions to Exclude. It first stated, "[C]ourts have an obligation to act as a gatekeeper to screen irrelevant evidence from the jury" and that "motions in limine may be used early in the litigation process to narrow the issues and reasonably limit discovery." (Quotation simplified.) Accordingly, the court determined it was "well within its authority to address the substantive issues of the [Motions to Exclude]."

¶16 The court then addressed the substantive arguments. It first determined that mining in areas covered by the Proposed Permit was legally feasible because the Proposed Permit had been submitted and there was reason to believe it would actually be approved. But the court also determined that Marriott's plans to mine in areas that would require him to relocate the Utility Lines or obtain a mining permit for areas not covered by the Proposed Permit were conjectural or speculative potential uses that were not legally feasible. The court therefore ordered that "any evidence of alleged losses or valuation theories premised upon" those two development plans "are excluded from and shall not be introduced in this matter."

¶17 Following the district court's ruling, the parties entered a settlement agreement, reserving the right to appeal the district court's previous rulings. After that, the district court entered a final judgment of condemnation. Marriott now appeals and Rocky Mountain cross-appeals.

ISSUES AND STANDARDS OF REVIEW

¶18 Marriott argues that the district court erred in granting the Motions to Exclude on two grounds. First, he asserts that the court "adopted and applied an incorrect legal feasibility analysis" by ruling that "condemnees must request and receive permission from the entity with authority to approve or deny a

proposed use for [that] use to be considered legally feasible." Second, he argues that the court erred in granting the Motions to Exclude before he had a "full and fair opportunity to complete fact and expert discovery." "We review the legal questions underlying the admissibility of evidence for correctness and the district court's decision to admit or exclude evidence for an abuse of discretion." *Blackhawk Townhouses Owners Ass'n Inc. v. J.S.*, 2018 UT App 56, ¶ 17, 420 P.3d 128.

¶19 Rocky Mountain cross-appeals. It contends that the district court erred in granting Marriott partial summary judgment on the Canal Provision. "We review a district court's decision to grant summary judgment for correctness, with no deference to the district court's conclusions." *School & Institutional Trust Land Admin. v. Mathis*, 2009 UT 85, ¶ 10, 223 P.3d 1119.

ANALYSIS

I. Legal Feasibility of Potential Mining

¶20 Marriott argues that the district court erred in granting the Motions to Exclude. We agree. To show that a proposed "highest and best use" of condemned land is legally feasible, a landowner "must offer the testimony of a properly qualified expert." *City of Hildale v. Cooke*, 2001 UT 56, ¶ 25, 28 P.3d 697 (quotation simplified). Although "admission of such evidence is within the sound discretion of the [district] court," *State ex rel. Road Comm'n v. Jacobs*, 397 P.2d 463, 464 (Utah 1964), the court abuses its discretion when it denies the landowner a fair opportunity to develop the essential elements of his claim. Because Rocky Mountain filed the Motions to Exclude before the close of fact discovery and before expert discovery began, the court erred in ruling on the legal feasibility of Marriott's proposed "highest and best use" at that time.

¶21 Municipalities in Utah have authority to condemn property for public use. *See* Utah Const. art. XI, § 5. And for certain uses, "the legislature has delegated its power of eminent domain to public utilities." *Williams v. Hyrum Gibbons & Sons Co.*, 602 P.2d 684, 686 (Utah 1979). For example, a public utility may, under the proper circumstances, condemn private property for the construction of "electric power lines." Utah Code Ann. § 78B-6-501(8) (LexisNexis 2012). But the authority to condemn private property for public use is constrained by Article I, Section 22 of the Utah Constitution. *See City of Hildale*, 2001 UT 56, ¶ 18. Article I, section 22 states, "Private property shall not be taken or damaged for public use without just compensation." Utah Const. art. I, § 22.

¶22 In condemnation proceedings, the "just compensation" requirement is satisfied by putting the landowner "in as good a position money wise as [he] would have occupied had [his] property not been taken." *City of Hildale*, 2001 UT 56, ¶ 19 (quotation simplified). That is, the "compensation must reflect the fair value of the land to the landowner." *Utah Dep't of Transp. v. Admiral Beverage Corp.*, 2011 UT 62, ¶ 28, 275 P.3d 208 (quotation simplified). Generally, the landowner is entitled to damages equal to the "fair market value" of the condemned land. *State ex rel. Road Comm'n v. Noble*, 305 P.2d 495, 497 (Utah 1957) (quotation simplified). And "[w]hen the land that is condemned constitutes only a portion of a larger parcel, a landowner may [also] be entitled to . . . 'severance damages' for any diminution in the value of the remaining portion of the landowner's property, as long as the landowner can demonstrate that the diminution in value was caused by the taking." *Utah Dep't of Transp. v. Target Corp.*, 2018 UT App 24, ¶ 15, 414 P.3d 1080, *cert. granted*, 425 P.3d 800 (Utah 2018). Severance damages are "determined by comparing the market value of the portion of property not taken with its market value before the taking." *Admiral Beverage Corp.*, 2011 UT 62, ¶ 30.

¶23 To calculate "fair market value," the jury is asked to determine what a willing buyer would have paid to a willing seller, *see Salt Lake City Corp. v. Utah Wool Pulling Co.*, 566 P.2d 1240, 1242 (Utah 1977), on "the date of the service of summons," *see* Utah Code Ann. § 78B-6-512(1) (LexisNexis 2012) ("[T]he right to compensation and damages shall be considered to have accrued at the date of the service of summons."). But fair market value is not determined "by taking a temporal snapshot of the land's value according to its use at" the date of the condemnation. *City of Hildale*, 2001 UT 56, ¶ 22. Instead, the calculation is "based upon the highest and best use" to which the land could have been put at that time. *See Jacobs*, 397 P.2d at 464. To that end, the jury must consider "all factors . . . that a prudent and willing buyer and seller, with knowledge of the facts, would take into account, including any potential development that could be performed on the property." *City of Hildale*, 2001 UT 56, ¶ 22 (quotation simplified).

¶24 Not every proposed "highest and best use" alleged by a landowner should be considered by the jury. *See Jacobs*, 397 P.2d at 464 (determining that whether to admit evidence of a "projected use, affecting value," is "within the sound discretion of the [district] court"). Only potential uses that are likely to have an "appreciable influence upon the market value of the property" are relevant. *Id.* at 465 (quotation simplified). Because a prudent buyer or seller would not consider "totally conjectural or speculative potential uses," *City of Hildale*, 2001 UT 56, ¶ 23, the district court should exclude evidence of such uses, *see Jacobs*, 397 P.2d at 465.

¶25 The jury's determination should "reflect only potential development that *could with reasonable certainty be expected* with respect to the property." *City of Hildale*, 2001 UT 56, ¶ 23 (quotation simplified). It is insufficient to show that a potential use is merely possible because "the land is adaptable to a particular use in the remote and uncertain future." *Id.* (quotation

simplified). Instead, a landowner must show that the proposed use is actually "feasible." *Id*. And to prove a proposed use is feasible, a landowner must establish "three specific elements." *Id*. ¶ 24. Those elements are physical feasibility, legal feasibility, and economic feasibility. *See id.*

¶26    Here, Marriott's proposed "highest and best use" of the relevant land was mining sand and gravel aggregate. The district court found that Marriott established both the physical and economic feasibility of that use. But it determined that the potential mining was not legally feasible because of various legal barriers. Thus, we limit our discussion to legal feasibility.

¶27    To establish legal feasibility, the landowner must prove that "the land is legally available for the potential use, or that any legal restrictions currently preventing the potential use have a reasonable probability of being modified so that they no longer pose a barrier." *Id*. When a legal barrier prevents a proposed use, the jury should consider the value of that use only if the prospect of removing the barrier "is sufficiently likely as to have an appreciable influence upon . . . the market value of the property at the time of the [condemnation]." *See Jacobs*, 397 P.2d at 465 (determining that the probability of a zoning restriction being repealed or amended so as to permit the use in question may be considered if "such repeal or amendment is sufficiently likely as to *have an appreciable influence upon present market value*" (quotation simplified)). Simply put, the jury should consider only potential uses that would be relevant to prudent sellers and purchasers on the open market. *See City of Hildale*, 2001 UT 56, ¶ 22 ("[C]onsideration must be given to all factors bearing upon such value that a prudent and willing buyer and seller, with knowledge of the facts, would take into account, including any potential development that could be performed on the property." (quotation simplified)). And when removing a legal barrier to a proposed use is reasonably probable, such a potential use may enter that equation. *See id.* ¶¶ 23–24.

¶28 Landowners may attempt to show that removing a legal barrier is reasonably probable by detailing the steps they have taken to remove it. *See id.* ¶ 25. But the landowner's testimony alone is legally insufficient. *See id.* ¶¶ 25, 28 (determining that, without expert testimony regarding condemned land's highest and best use, the landowners' testimony that "they were in the process of obtaining the legal permissions needed to proceed" with their proposed development was "conjectural and speculative"). Ultimately, "the landowner must [first] offer the testimony of a properly qualified expert." *Id.* ¶ 25; *see also Utah Dep't of Transp. v. Jones*, 694 P.2d 1031, 1036 (Utah 1984) (determining that "highest and best use" is a term of art and "[t]estimony regarding it must come from properly qualified experts").

A.     Relocation of the Utility Lines

¶29 Marriott argues that the district court erred in ruling, before the close of fact and expert discovery, that he could not establish the legal feasibility of potential mining that depended on his ability to relocate the Utility Lines. We agree.

¶30 It is undisputed that, at the time of the condemnation, Marriott did not have the legal right to relocate the Utility Lines. But Marriott was not required to show that obtaining relocation was certain, only that it was reasonably probable. *See City of Hildale v. Cooke*, 2001 UT 56, ¶ 24, 28 P.3d 697. The record established that, under certain circumstances, Rocky Mountain and Questar agreed to relocate their utility lines. Both companies allowed servient landowners to submit relocation requests and decided to grant or deny those requests according to established procedures. To show the legal feasibility of his proposed potential mining, Marriott was required to show that, given those procedures and all other relevant factors, the prospect of relocating the Utility Lines to develop the mining operation was reasonably probable at the time of the condemnation. *See id.*

¶31     In its ruling, the district court noted that Marriott never initiated the relocation process. To the extent the court determined this was dispositive, that ruling was erroneous. In fact, any steps Marriott had taken to relocate the Utility Lines were necessarily insufficient. *See id.* ¶ 25 ("[A] landowner may testify concerning the individual elements of feasibility, but that landowner must offer the testimony of a properly qualified expert to prove the actual feasibility of a potential use."). Marriott was required to first present testimony from a qualified expert that the potential mining was the relevant land's "highest and best use." *See id.* (quotation simplified). And an expert could testify that the potential mining was the "highest and best use" only by testifying to the legal feasibility of that use. *See id.* That is, that relocating the Utility Lines was reasonably probable. *See id.* When Rocky Mountain filed the Motions to Exclude, the time for expert disclosure and discovery had not yet started. Thus, Marriott was denied a fair opportunity to obtain and present evidence that was essential to his claim.[2]

---

2. We note that although our rules establish no firm deadline for filing motions in limine, such motions are typically filed after discovery has concluded and before trial. Had these issues been presented in the context of a motion for partial summary judgment, Marriott easily could have filed an affidavit under Utah Rule of Civil Procedure 56(d) asking the court to delay its decision until further discovery had been conducted, and, in this case, expert disclosures and discovery undertaken. We do not think district courts should easily allow parties to avoid the strictures of summary judgment procedures by presenting dispositive issues in motions in limine. Here, the Motions to Exclude were employed in lieu of a motion for summary judgment without the safeguards offered by that rule to ensure that the case was decided on its merits.

¶32 Marriott asserts on appeal, as he did below, that he intended to retain expert witnesses who would testify to the likelihood, under the circumstances, that Rocky Mountain and Questar would have granted his relocation requests. To that end, he requested production of documents that referenced instances in which Rocky Mountain approved or rejected a third party's request to relocate power lines, but Rocky Mountain refused to produce those documents based on the pendency of the Motions to Exclude. This evidence was essential to establishing that mining was the land's "highest and best use." We therefore conclude Marriott did not have a fair opportunity to develop his claim that relocating the Utility Lines was reasonably probable.

¶33 Rocky Mountain argues that expert testimony would not have been helpful. It notes, "[B]ecause [Questar and Rocky Mountain] were never asked to assess a potential relocation, they did not know whether a relocation . . . would even have been possible, let alone approved." Further, it notes that "merely because a utility has granted or denied a relocation in one instance . . . does not mean that the same utility will agree to relocate another line" under different circumstances.

¶34 Rocky Mountain's arguments are mistaken because they assume an incorrect legal standard. The uncertainty regarding the relocation of the Utility Lines created a legal feasibility issue, but it should not have determined the outcome. When a legal barrier prevents a proposed "highest and best use," the ability to remove that barrier will always be uncertain to some degree. But a landowner need not show that a legal barrier will certainly be removed, he must show only that its removal is reasonably probable. *See City of Hildale*, 2001 UT 56, ¶ 24. The jury should consider potential uses that would be relevant to prudent sellers and purchasers on the open market. *See id.* ¶ 22. And when the ability to engage in a proposed use is feasible because removing a legal barrier is reasonably probable, such a potential use enters that equation.

¶35    Here, a properly qualified expert might have testified to the *probability*, given the circumstances, that requests to relocate the Utility Lines would have been granted. Marriott was entitled to present such evidence to the district court. Because he was denied that opportunity, we conclude the district court erred in ruling, before the close of fact and expert discovery, that Marriott could not establish the legal feasibility of mining that depended on relocating the Utility Lines.

B.    Mining in Unpermitted Areas

¶36    Marriott argues the district court erred in ruling, before the close of fact and expert discovery, that he could not establish the legal feasibility of mining in areas that were not permitted under the Proposed Permit. We agree.

¶37    In its ruling, the district court first found that Marriott had established the legal feasibility of mining areas covered by the Proposed Permit because the Proposed Permit had been submitted and there was reason to believe it would actually be approved. But as to areas outside the Proposed Permit, the court stated that "it appears uncertain as to when or if any application, revision[,] or amendment" to allow mining outside the Proposed Permit would be made. The court continued, "[I]t is uncertain how DOGM would respond to such a request or whether it would approve additional areas on [the Property] for mining." Based on these observations, the court concluded, "[P]lans to mine currently unpermitted areas [are] conjectural or speculative potential uses that are not legally feasible."

¶38    The court's analysis was misguided. As with relocating the Utility Lines, the uncertainty of obtaining authorization to mine outside the Proposed Permit created a legal feasibility issue, but that uncertainty should not have determined the outcome. To show that mining in unpermitted areas was legally feasible, Marriott did not need to have the legal right to mine

those areas, nor was he required to start the process of obtaining that right. Instead, he was required to show that the likelihood of obtaining approval to mine those areas was reasonably probable so as to have an appreciable influence upon market value. *See State ex rel. Road Comm'n v. Jacobs*, 397 P.2d 463, 465 (Utah 1964).

¶39    As explained above, *see supra* ¶ 28, expert testimony was essential to show that mining of gravel and sand aggregate was the relevant land's highest and best use, *City of Hildale v. Cooke*, 2001 UT 56, ¶ 25, 28 P.3d 697. And to show that mining was the highest and best use, an expert was required to testify that mining was legally feasible, i.e., that obtaining the proper permits was reasonably probable. *See id.* ¶¶ 24–25. And if obtaining those permits was reasonably probable, the proposed mining development was likely relevant to the market value of the Property. *See Cornish Town v. Koller*, 817 P.2d 305, 313–14 (Utah 1991) (determining that, although uncertain and speculative, the potential to exploit "in-place minerals" has a market value and is thus admissible to determine just compensation).

¶40    A properly qualified expert might have testified to the *probability*, given the circumstances, that a request to mine the unpermitted areas would have been granted. Marriott asserts on appeal, as he did below, that he intended to retain expert witnesses to establish the legal feasibility of receiving permission to engage in the proposed mining. But because Rocky Mountain filed the Motions to Exclude before fact discovery concluded and before expert discovery began, Marriott was denied the opportunity to present this essential evidence.

¶41    We therefore conclude that the district court erred in ruling, before the close of fact and expert discovery, that Marriott did not establish the legal feasibility of mining areas that were not included in the Proposed Permit.

II. The Canal Provision

¶42   Rocky Mountain cross-appeals, arguing that the district court erred when it granted partial summary judgment to Marriott on the Canal Provision. We disagree. Because the Canal Provision was contrary to Utah condemnation law, we affirm the district court's decision to grant Marriott partial summary judgment and strike the Canal Provision from the amended condemnation complaint.

¶43   In condemnation cases, "the right to compensation and damages shall be considered to have accrued at the date of the service of summons." Utah Code Ann. § 78B-6-512(1) (LexisNexis 2012). And the condemning party "shall, within 30 days after final judgment, pay the sum of money assessed." *Id.* § 78B-6-514.

¶44   The Canal Provision was at odds with the requirement that condemning parties pay compensation and damages within 30 days after final judgment because it gave Rocky Mountain the option to pay part of Marriott's potential "just compensation" at some time in the future. It provided that, if Marriott received written approval from the federal government to relocate the Canal, Marriott could request that Rocky Mountain relocate the New Line to allow mining operations on the supporting land. If that happened, Rocky Mountain would have been obligated to either relocate the New Line at its own expense or pay Marriott "the fair market value of the Deposits that would otherwise be made accessible for mining by the relocation of the [New Line]."

¶45   Rocky Mountain disagrees with this interpretation. It argues that, under the Canal Provision, "relocation would be at the option of [Marriott], not [Rocky Mountain]." But the Canal Provision clearly provided otherwise. It stated, "[Rocky Mountain] shall have the option of paying [Marriott] the fair market value of the Deposits that would otherwise be made

accessible for mining by the relocation of the [New Line]. This option shall be *in lieu of* relocating the [New Line]." (Emphasis added.) The Canal Provision's language clearly gave Rocky Mountain the option to pay part of Marriott's potential "just compensation" at a future, indefinite time.

¶46 Further, even if the Canal Provision required Rocky Mountain to relocate the New Line according to Marriott's future needs, the Utah Supreme Court has disapproved of such "floating" easements. *See Jacobson v. Memmott*, 354 P.2d 569, 571 (Utah 1960). That is because, in condemnation proceedings, we attempt to compensate the landowner for all property rights condemned. *Id.* And a relocation provision leaves the landowner "with the uncertainty of not knowing, nor being able to prove, the extent to which the [easement] will damage his property, because of the difficulties in presaging what might later occur." *Id.* It is therefore "more practical and in conformity with established patterns of law" to require condemning parties "to make a definite designation of it so that the damages to the [landowner] may be ascertained." *Id.*

¶47 We therefore conclude that the Canal Provision was contrary to Utah law and affirm the district court's grant of partial summary judgment to Marriott on that provision.

CONCLUSION

¶48 We affirm the district court's grant of partial summary judgment to Marriott on the Canal Provision, but we reverse its ruling on the Motions to Exclude and remand to the district court for further proceedings consistent with this opinion.

_____