2002 UT 34

**STATE of Utah, Plaintiff and Appellee,**

v.

**Jeffrey Dean MARTIN, Defendant and Appellant.**

**No. 20000853.**

Supreme Court of Utah.

March 29, 2002.

Mark L. Shurtleff, Att'y Gen., Marian Decker, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Scott C. Williams, Linda M. Jones, Salt Lake City, for defendant.

1. As a general matter, "[w]e view the facts in the light most favorable to the jury verdict" and recite them as such. *State v. Loose*, 2000 UT 11, ¶ 2, 994 P.2d 1237. In this case, however, it is necessary to recite the testimony of both Egan and Martin in order to fully understand the issues raised on appeal. We present the facts accordingly. *See State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116.

## AMENDED OPINION

RUSSON, Associate Chief Justice.

¶ 1 Defendant Jeffrey Dean Martin ("Martin") appeals the denial of his motion for a new trial, which was based on new evidence discovered following our remand order in *State v. Martin*, 1999 UT 72, 984 P.2d 975 ("*Martin I*"). Prior to our remand order, a jury convicted Martin of rape, a first degree felony, in violation of Utah Code Ann. § 76–5–402 (1999), aggravated kidnaping, a first degree felony, in violation of Utah Code Ann. § 76–5–302 (1999), and three counts of forcible sodomy, also a first degree felony, in violation of Utah Code Ann. § 76–5–403(2) (1999). We reverse and remand.

## BACKGROUND

### I. TRIAL

¶ 2 This case arises from events that occurred on the night of December 29, 1996, for which the State charged Martin with rape, kidnaping, and three counts of forcible sodomy. The sole evidence introduced at trial of Martin's actions that night were the conflicting accounts given by Martin's victim, Lorraine Egan ("Egan"), and Martin himself.[1]

### A. Egan's Testimony

¶ 3 According to Egan, Martin's attack began just after 7:00 p.m. when she arrived at a grocery store near her home to purchase prepackaged potatoes, which her family had sent her to buy as a last-minute addition to their dinner, and two candles for a "meditation technique" she and her sister had previously discussed trying. After completing her purchase, Egan walked to the store's parking lot to retrieve her car and drive home. Just as she was starting her car, however, Egan noticed Martin approaching the side of her vehicle, waving to her. Egan responded by cracking her car door open in order "to hear what [Martin] was going to say." Martin told Egan that he had observed someone break into her car, take something, and place

it in a nearby pickup truck. When Egan heard this, she turned off her engine and stepped out of the vehicle "to see if someone had been in [her] car." Then, as Egan was standing in the parking lot, Martin put a gun to her stomach and forced her "to get back into the car" and "slide to the passenger's side."

¶ 4 In the car, Martin told Egan that if she did not "scream or try to get away, . . . he would let [her] go." Martin then handcuffed Egan's arm to his and ordered Egan to restart the car. Following Martin's orders, Egan turned the car's ignition key, and Martin drove out of the grocery store parking lot. After traveling approximately eight blocks, Martin stopped the car "in a parking lot right behind the [local] police station," where Martin commanded Egan to perform oral sex on him. Egan complied with this demand because she "was afraid of what [Martin] would do" to her if she "didn't do as he [said]." Thereafter, Martin drove back to the grocery store where he had abducted Egan.

¶ 5 Upon returning to the grocery store, Martin maneuvered the car into a stall near his semitrailer truck, which was parked at the edge of the grocery store lot. Martin next led Egan into his truck, removed the handcuff from his arm, and placed it on the gearshift inside his truck. Asking Egan the location of the nearest freeway, Martin then drove his truck north and west to a deserted area, where he eventually parked on the side of the road.

¶ 6 Once Martin had parked his truck, he began inquiring into Egan's personal life, repeatedly asking questions about her family, job, and living situation. While asking these questions, Martin was simultaneously attempting to remove the handcuffs from the truck's gearshift and Egan's wrist. In the process of removal, however, the key to the handcuffs broke, and Martin therefore unlocked the restraints with matchsticks. Having removed the handcuffs, Martin instructed Egan to lie down on the bed in the back of his truck.

¶ 7 On the bed, Martin "told [Egan] to put [her] arms around him." Martin then kissed Egan on the mouth and ordered her to perform oral sex on him, which she did despite the fact that she did not "want to." After "five [to] ten minutes," Martin pushed Egan off of him and told her to remove her clothes. Martin next "put his mouth on [Egan's] vagina" on two separate occasions, ordered Egan to sit on his face and perform oral sex again, and, ultimately, engaged in vaginal intercourse with Egan.

¶ 8 Following the events on the bed, Martin placed his hand on Egan's throat and stated three times, "You know, I can't let you go. I can't trust you, that you won't tell." Immediately thereafter, Martin removed a stun gun from a cabinet in his truck, "showed [Egan] how it worked, and . . . handed it to [Egan]." Upon receiving the stun gun, Egan backed away from the bed and toward the door of the truck. Seeing this, Martin stood up, began walking toward Egan, and stated, "Don't do this." Egan then attempted to use the stun gun on Martin's neck, but Martin grabbed Egan's wrist and ordered her to drop the weapon. After Egan dropped the stun gun, Martin pulled out the handgun he had used to abduct her, showed her that it was loaded, and "handed [her] the gun." Again armed, Egan pointed the gun at Martin and pulled the trigger. The gun, however, failed to fire, so Martin instructed Egan "to point the gun at his chest" and shoot him because he "knew what all the other people would do to him" in prison. Egan declined, handed the gun back to Martin, and informed him that she wanted to go home.

¶ 9 Thereafter, Martin began rummaging through Egan's wallet. After he finished, Martin forced Egan to write down her contact information on a sheet of paper. Once Egan had written down her contact information, Martin gave her seventy dollars because "he was sorry [for] what he did" and because he wanted to "help [Egan] out." Martin also told Egan that if he "could see [her] again," he would let her go. Accordingly, Egan agreed to date Martin in the future and arranged to have him call her at work the next day.

¶ 10 Believing he had convinced Egan that they should continue their relationship in the future, Martin told Egan to get dressed.

Martin then began driving back to the grocery store. On the drive, Martin volunteered various personal information about himself. Egan, in a continuing effort to maintain Martin's trust, participated in the exchange, asking Martin about his zodiacal sign, describing her "interest in fantasy things and dragons," and accepting a stuffed toy dragon that Martin presented to her as a gift. Martin also told Egan about the trucking company for which he was working and showed her the "name of the company" on the side of his truck.

¶ 11 Before they reached the store, Martin drove Egan to a payphone, where she called her family and explained that she had not yet returned from the grocery store because, as Martin had urged her to say, she met a friend who had purchased a new car, they had gone for a ride, but the car had malfunctioned. After the phone call, Martin and Egan walked back to the truck, where Martin informed Egan that he "wanted to [buy her] a house" and "support" her because he "wanted someone to cook for him and clean his truck." Subsequently, at approximately 10:00 p.m., Martin returned Egan to her car. As she left, Martin stated to her, "We started this way. We should end this way." Egan then drove home.

### B. Martin's Testimony

¶ 12 Following the State's case in chief, Martin took the witness stand to testify to his version of what occurred on the night of December 29, 1996. According to Martin, his entire encounter with Egan was consensual and mutual:

¶ 13 Martin stated that he had been at the grocery store for approximately one hour when he first "exchanged eye contact" with Egan as he was walking out of, and she was walking into, the store. From this brief encounter, Martin decided that he wanted to meet Egan because he "liked [her] smile" and thought she "was pretty."

¶ 14 Accordingly, Martin approached Egan at her car when she exited the grocery store. Although "nervous" and "stuttering" to a degree, Martin waved at Egan and stated, "Hi, my name is Jeff." Egan was "a little startled" by Martin's initial approach, but as their discussion at her car progressed, she became "relaxed" and "open" and started smiling. Eventually, Martin noticed that Egan was shivering and, because it was cold outside, suggested that they move inside his truck to continue their conversation.

¶ 15 During their conversation in his truck, Martin asked Egan if she wanted to accompany him on a drive. Egan responded that she "should be getting home," but indicated that she would like to go along regardless. Although neither Martin nor Egan was "really ... paying attention to exactly where [they] were going" on the drive, Martin ultimately parked the truck under a street light on a road off the highway.

¶ 16 Having parked, Martin and Egan continued the conversation they had been engaging in throughout the drive. Egan asked Martin what his zodiacal sign was, "told [Martin] her sign," and informed Martin that their signs were "really compatible." Egan also explained to Martin the location of various astrological constellations, which they could see through an opening in the roof of the truck's cab. After viewing these constellations for "a while," Martin suggested that he and Egan move to his bed in the back of the truck, which would be more "comfortable" than remaining in their present location in the front of the truck.

¶ 17 On the bed, Martin and Egan continued "looking at the stars, [engaging in] more small talk," and exchanging information about their personal lives. As this conversation progressed, however, it soon evolved into "mutual" physical contact between both Martin and Egan, including hand holding, shoulder massaging, kissing, reciprocal oral sex, and, ultimately, intercourse.

¶ 18 During this foray on the bed, Egan asked Martin about "how [he] protect[ed][him]self." Confused about whether Egan was referring to contraception or something else, Martin responded, "Do you mean like a gun or something?" Acknowledging that she had indeed been referring to guns, Egan then indicated that she "wanted to ... see" any guns Martin had with him. Accordingly, Martin retrieved his stun gun and handgun from a cabinet, showed Egan

how to use them, and allowed her to handle them. Martin also displayed to Egan a pair of handcuffs that he kept in the truck, and the two then handcuffed their arms to each other. When Martin attempted to unlock the handcuffs, however, the key broke, so Martin and Egan used matches to "pry [the handcuffs] open."

¶ 19 After intercourse, Martin and Egan dressed themselves and continued talking and looking at the stars. Egan told Martin that "she wasn't very happy with the way her life was headed," with "[h]er living conditions," or with "[her] financial situation." In response, Martin informed Egan that his living situation was likewise "pretty bad," that he was "very interested" in Egan, and that he wanted to have a relationship with her. As a result, Martin told Egan how to contact him, and the two arranged a time the next day when Martin could call Egan at work.

¶ 20 On the return drive to her car, Egan indicated that she "needed to get back" and that she was "concerned [about] what was going to happen at home." Consequently, Martin and Egan concocted a story "together" that Egan had met a friend who had just purchased a car, and that she had decided to go for a ride with him but was unable to telephone her family because the car broke down. Martin then drove to a payphone so Egan could call home to explain what had caused her delay in returning. Following this call, Martin and Egan conversed for an additional "ten or fifteen minutes" in his truck before finally driving back to the grocery store where Egan's car was parked. At the parking lot, Martin and Egan again talked "for a few more minutes," ultimately parting after Egan reminded Martin that she "needed to get home." Leaving, Egan exclaimed, "Call me tomorrow."

### C. Jury Deliberation and Conviction

¶ 21 At the conclusion of Martin's testimony, the State and the defense presented their respective closing statements to the jury. Arguing its case, the State contended that because Martin admitted performing the actions for which he was charged, the jury's only obligation was to assess whether Egan had consented to those acts. The State ex-

plained, "This case is not a 'whodunit.' This case is not 'it didn't happen.' This case is simply and narrowly an issue of consent."

¶ 22 Accordingly, the State asserted that the assessment of whether Egan had consented to engage in sexual acts with Martin hinged entirely upon whose story the jury believed. The prosecutor stated:

[I]f you don't believe one party on how they met, you can't believe that same person about what happened thereafter....

. . . .

So, in other words, the whole ball of wax really rests up front on how [Egan and Martin] met and who you believe on how they met. Because if you believe her, she is telling the truth about being kidnapped at gunpoint, she was raped. Vice versa, if you accept his stories on how they met and his version, his story of how things went after that, then it was consensual.

Summarizing for the jury, the State continued:

What I am simply saying is if you [consider] their two versions of how they met ..., you then have to accept the person you believe ..., because it can't go the other way. It just doesn't make sense.

Pursuing this logic, the State urged the jury to find Martin guilty as charged because Egan's story was "reasonable" and comported with "common sense," while Martin's version of the events was "unreasonable," "difficult to swallow," and "leaking like crazy." In support of this contention, the State reminded the jury that Egan had traveled to the store "to pick up a last-minute item" for her family's dinner, and that, in fact, Egan's sister had testified it was "surprising" Egan did not return home immediately because she was responsible and dependable and "isn't like that."

¶ 23 Following its deliberations, the jury unanimously convicted Martin of rape, aggravated kidnaping, and three counts of forcible sodomy, all first degree felonies. Thereafter, on February 13, 1998, the trial court sentenced Martin to indeterminate terms of five years to life for rape, six years to life for aggravated kidnaping, and five years to life

on each count of forcible sodomy, all sentences running concurrently.

## II. *MARTIN I*

¶ 24 Prior to Martin's first trial, he discovered Egan had accused another man of raping her in September 1996. Martin sought to discover the identity of the person who had been accused. The court denied Martin's motion. Following his conviction, Martin moved for a new trial, claiming among other things that his due process rights had been violated when the trial court denied his motion to discover the man's identity. The trial court denied the motion for a new trial, and Martin appealed. In *Martin I*, we unanimously held that Martin was entitled to discover the information he sought, which carried "strong" impeachment value and could significantly impact "the central issue of the case-[whom] to believe about the circumstances of th[e] sexual contact." 1999 UT 72, ¶ 16, 984 P.2d 975. We therefore remanded the case for additional discovery:

> If Martin finds any new admissible evidence, the trial court must then hold a hearing to determine if Martin is due a new trial. In so doing, the trial court must decide whether there is a reasonable likelihood that the new evidence would lead a jury to an outcome more favorable to Martin. If so, and if the other factors laid out in [*State v. James*, 819 P.2d 781 (Utah 1991),] are present . . ., a new trial must be granted.

*Id.* at ¶ 17 (footnote omitted).

## III. REMAND

¶ 25 On remand, Martin was unable to ascertain the name of the individual who allegedly raped Egan in September 1996.[2] Martin did learn, however, that Egan became involved in the incident by accepting a ride from the unidentified person when he "pulled over" in a black sport utility vehicle as Egan was walking to school. During the subsequent eight-block drive to school, Egan and the stranger told each other their names, "exchanged phone numbers," and "made arrangements for him to pick [Egan] up after . . . school." Later, when the individual arrived to collect Egan from school, she entered his vehicle and accompanied him to his apartment. In the apartment, Egan talked with the stranger and exchanged additional personal information. Egan remained at the apartment for approximately two to three hours.[3]

¶ 26 On March 16, 2000, based on the information he discovered concerning the September 1996 incident, Martin again moved for a new trial. Specifically, Martin argued that the newly discovered evidence supported his charge at trial that Egan willingly entered his truck despite the fact that she had just met him, and thus, directly refuted the State's theory of the case, which cast Egan's version of the events as "the only one" that was credible or comported with "common sense." On May 24, 2000, the State responded to Martin's motion, contending that he was not due a new trial because the recently discovered evidence was both inadmissible and immaterial.

¶ 27 Shortly thereafter, on June 27, 2000, the trial court denied Martin's motion for a new trial. Finding the newly discovered evidence inadmissible, the court ruled:

> [T]he fact that Ms. Egan accepted a ride in the past while walking to school does not logically give rise to an inference that she would have willingly abandoned her plans to bring dinner home to her child and family . . . and decide to go for a ride with the defendant. These specific circumstances make this case sufficiently attenuated from Ms. Egan's previous acceptance of a ride from a stranger as to render this evidence irrelevant. Moreover, what the defendant is seeking to introduce is [inadmissible] propensity evidence, i.e.[,] that because Ms. Egan had previously gotten into a stranger's car willingly, she must have conducted herself similarly in this

---

2. In an evidentiary hearing conducted by the trial court, both Egan and her sister, whom Egan had told about the September 1996 incident, testified that they did not remember the name or contact information of the alleged rapist.

3. Although Egan alleges that she was raped while in the stranger's apartment, Martin does not seek to introduce any evidence related to the alleged rape. *See infra* ¶¶ 41 42.

case.... [Finally], this evidence runs afoul of Utah Rule of Evidence 412, if the defendant's argument is that because Ms. Egan has willingly gotten into a car with a strange man in the past, she has a certain sexual predisposition.... For all of these reasons, the [c]ourt concludes that this evidence is not admissible.

In making its ruling, the court also held that even if the newly discovered evidence were admissible, it would not warrant a new trial because of its "insignifican[ce] given the totality of the evidence against the defendant and the fact that the focus of the prosecution's case was not simply on how the parties met, but that Ms. Egan was set to other tasks when she was taken at gunpoint by the defendant." Martin now appeals the trial court's denial of his March 16, 2000, motion for a new trial.

## ANALYSIS

¶ 28 On appeal, Martin asserts that the trial court erred by (1) improperly deeming the newly discovered evidence inadmissible and (2) incorrectly ruling that the evidence did not satisfy the burden for granting a new trial.[4] We address each issue in turn.

### I. ADMISSIBILITY

¶ 29 We first examine the question of whether the trial court improperly deemed inadmissible the newly discovered evidence concerning Egan's acceptance of a ride from a stranger in September 1996. The question of whether evidence is admissible can be either a question of discretion, which we review for abuse of discretion, or a question of law, which we review for correctness. Once the prosecution affirmatively presents evidence, the defendant then has the right, as a matter of law, to rebut that evidence, and we review a trial court's complete preclusion of rebuttal evidence for correctness. However, the trial court retains broad discretion in determining the nature and extent of rebut-

tal evidence, and we review a trial court's ruling regarding the nature and extent of such evidence for an abuse of discretion. In this case, the trial court held that the newly discovered rebuttal evidence was inadmissible as "irrelevant," as constituting improper character propensity evidence, and as "run[ning] afoul" of Utah Rule of Evidence 412's prohibition on sexual proclivity evidence. We conclude that the trial court erred on all three grounds.

### A. Relevance

¶ 30 The trial court's first basis for deeming the newly discovered evidence inadmissible was that the evidence was not relevant.

¶ 31 Evidence is relevant if it possesses "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401. In other words, even evidence that is only slightly probative in value is relevant. *State v. Colwell*, 2000 UT 8, ¶ 27, 994 P.2d 177; *see also Robinson v. All–Star Delivery, Inc.*, 1999 UT 109, ¶¶ 26–27, 992 P.2d 969; *State v. Jaeger*, 1999 UT 1, ¶ 12, 973 P.2d 404.

¶ 32 In this case, the trial court held that the newly discovered evidence was irrelevant because it was "sufficiently attenuated" from what Martin claimed had happened during his encounter with Egan. Specifically, the court ruled that the evidence was irrelevant because "Egan's previous acceptance of a ride from a stranger ... while walking to school does not logically give rise to an inference that she would have willingly abandoned her plans to bring dinner home to her child and family ... and ... go for a ride with the defendant." This decision was erroneous.

¶ 33 As we recognized in *Martin I*, the "central issue" at Martin's trial was "[whom] to believe about the circumstances of th[e]

4. Martin also contends that the trial court erred by refusing to grant him a new trial based on additional evidence he discovered on remand concerning Egan's psychological records. Martin argues this evidence demonstrates that Egan is "impulsive and unpredictable." However, Martin never raised this argument below, and he

thus waived his right to urge its consideration on appeal. *E.g., Associated Gen. Contractors v. Bd. of Oil, Gas & Mining*, 2001 UT 112, n. 5, 38 P.3d 291; *State v. Bisner*, 2001 UT 99, ¶ 39, 37 P.3d 1073; *City of Hildale v. Cooke*, 2001 UT 56, ¶ 16, 28 P.3d 697.

sexual contact." 1999 UT 72 at ¶ 16, 984 P.2d 975. Indeed, the only direct evidence offered against Martin was Egan's testimony, and the State itself argued to the jury that "[t]his case is simply and narrowly an issue of consent." In fact, the prosecution admitted in its closing argument that

> the whole ball of wax really rests up front on how [Egan and Martin] met and who you believe on how they met. Because if you believe her, she is telling the truth about being kidnapped at gunpoint, she was raped. Vice versa, if you accept his stories on how they met and his version, his story of how things went after that, then it was consensual.

Accordingly, the evidence of Egan's acceptance of a ride from a stranger in September 1996 is relevant if it makes "more or less probable" Martin's contention that Egan willingly accompanied him for a ride on December 29, 1996, and thus, makes Egan's and Martin's respective testimonies more or less credible. Utah R. Evid. 401.

¶ 34 As noted above, the standard for determining the relevancy of evidence is "very low," and even evidence with the " 'slightest probative value' " is relevant. *Jaeger,* 1999 UT 1 at ¶¶ 12, 16, 973 P.2d 404 (quoting Edward L. Kimball & Ronald N. Boyce, *Utah Evidence Law* 4–2 (1996)); *see also Colwell,* 2000 UT 8 at ¶ 27, 994 P.2d 177; *Robinson,* 1999 UT 109 at ¶¶ 26–27, 992 P.2d 969. Applying this standard to the case at bar, it becomes clear that the evidence at issue is relevant. It is reasonable to believe that a person who has accepted a ride from a stranger in the past may do so again. *See Jaeger,* 1999 UT 1 at ¶ 16, 973 P.2d 404. Especially given that the evidence of Egan's encounter in September 1996—where she entered a stranger's vehicle just after meeting him, immediately exchanged personal information with him, and then agreed to accompany him on a ride a short time later—closely parallels the initial sequence of events outlined by Martin in his testimony, no legitimate argument can be made that this evidence does not possess at least some tendency of making Martin's version of the events that night more probable. *See* Utah R. Evid. 401; *see also State v. Nelson–Waggoner,*

2000 UT 59, ¶¶ 24, 27, 6 P.3d 1120 (finding evidence related to consent relevant in rape cases where consent is "the *only* issue at trial"). Rather, the trial court's determination that the newly discovered evidence was too "attenuated" from Martin's testimony to be relevant constitutes flawed reasoning that erroneously blurs the line between the evidence's relevance and weight. "[W]hile the remoteness of ... evidence may reduce its probative value, rule 401 states that relevant evidence is evidence that has '*any* tendency to make the existence of any fact ... more or less probable.' " *Jaeger,* 1999 UT 1 at ¶ 16, 973 P.2d 404 (quoting Utah R. Evid. 401). Indeed, we have repeatedly held that it is the jury, not the court, who "serves as the exclusive judge of both the credibility of the witness and the weight to be given particular evidence." *State v. Workman,* 852 P.2d 981, 984 (Utah 1993); *see also, e.g., Brewer v. Denver & Rio Grande W. R.R.,* 2001 UT 77, ¶ 36, 31 P.3d 557; *State v. Mead,* 2001 UT 58, ¶ 67, 27 P.3d 1115; *Child v. Gonda,* 972 P.2d 425, 433 (Utah 1998); *State v. Howell,* 649 P.2d 91, 97 (Utah 1982); *State v. Ervin,* 22 Utah 2d 216, 219, 451 P.2d 372, 373 (1969). It is neither our prerogative nor that of trial judges to "reweigh the evidence and determine where it preponderates." *Child,* 972 P.2d at 434; *see also State v. Hoffhine,* 2001 UT 4, ¶ 23, 20 P.3d 265. Accordingly, we hold that the trial court abused its discretion in this case by usurping the jury's function and excluding otherwise relevant evidence based on its weight.

### B. Character Propensity Evidence

¶ 35 The second ground upon which the trial court deemed inadmissible the evidence concerning Egan's acceptance of a ride from a stranger in September 1996 was that the information constituted impermissible character propensity evidence, namely, that "because ... Egan had previously gotten into a stranger's car willingly, she must have conducted herself similarly in this case."

¶ 36 The admissibility of character evidence is controlled by rules 404 and 405 of the Utah Rules of Evidence. As a general principle, rule 404 prohibits introduction of evidence concerning "a person's character or

a trait of character ... for the purpose of proving action in conformity therewith on a particular occasion." Utah R. Evid. 404(a). At the same time, however, rule 404 allows the admission of certain character propensity evidence if it qualifies under an exception to the rule's blanket prohibition. Specifically, one of rule 404's exceptions allows criminal defendants to offer evidence of a "pertinent trait of character of the victim of the crime." Utah R. Evid. 404(a)(2); *see also State v. Gotschall*, 782 P.2d 459, 463 & n. 4 (Utah 1989).

¶ 37 Where evidence of a "pertinent trait of character of the victim" is offered in a criminal case, rule 405 governs. Utah R. Evid. 404(a)(2); *see* Utah R. Evid. 405. That rule prescribes the dual manner in which character propensity evidence may be introduced. First, "specific instances" of a person's character may be admitted if the "character or a trait of character of [the] person is [an] essential element of a charge, claim, or defense." Utah R. Evid. 405(b); *see also State v. Miller*, 709 P.2d 350, 354 (Utah 1985). Second, to the degree character propensity evidence is admissible, "proof may be made by testimony as to reputation or by testimony in the form of an opinion." Utah R. Evid. 405(a); *accord United States v. Talamante*, 981 F.2d 1153, 1155–56 (10th Cir. 1992). When such testimony is given, moreover, evidence of "relevant specific instances of conduct" may be introduced on cross-examination to discredit the opinion or reputation testimony of a victim's character. Utah R. Evid. 405(a); *accord Talamante*, 981 F.2d at 1155–56; *Bright v. Shimoda*, 819 F.2d 227, 228 (9th Cir.1987).

¶ 38 In this case, the State argued that Egan's testimony constituted the true and correct version of what occurred on the night of December 29, 1996, because her account was "reasonable" and comported with "common sense," while Martin's explanation was "unreasonable" and "difficult to swallow." The clear import of this argument was that responsible people do not willingly enter the vehicle of a stranger only moments after initially encountering the individual, and that Egan is in fact a responsible person. In support of this contention, the State introduced evidence at trial of Egan's character as a dependable and responsible individual. Explaining that she was "surprised" Egan had not returned home shortly after leaving for the store, Egan's sister testified:

> Lorraine isn't like that. She is very dependable. She had a child waiting at home.... She is very dependable. [N]ormally, when she says she is going to do something, she does it. We expected her home in twenty minutes, and under any other circumstances she would have been home in twenty minutes.

Having introduced this evidence, the State placed Egan's character into question, and the defense was therefore allowed to discredit the testimony of Egan's sister by "inquir[ing] into relevant specific instances of conduct" that might contradict her opinion of Egan's character as dependable and responsible. Utah R. Evid. 405(a); *accord Bright*, 819 F.2d at 228. Indeed, we have already determined that the evidence of Egan's accepting a ride from a stranger in September 1996 is relevant to the "central issue" of this case—whose version of the events to believe—and we accordingly hold that the trial court erred by excluding that evidence as inadmissible character propensity evidence. *Martin I*, 1999 UT 72 at ¶ 16, 984 P.2d 975; *see supra* ¶ 34. While the Utah Rules of Evidence do generally prohibit evidence of "a person's character ... for the purpose of proving action in conformity therewith on a particular occasion," Utah R. Evid. 404(a), those same rules plainly allow a criminal defendant to attempt to discredit, with evidence of "specific instances of conduct," testimony of an alleged victim's relevant character once it has been introduced. Utah R. Evid. 405(a); *see Bright*, 819 F.2d at 228; Utah R. Evid. 404(a)(2).

### C. Sexual Proclivity Evidence

¶ 39 Finally, the trial court ruled that the newly discovered evidence was inadmissible because it violated Utah Rule of Evidence 412's prohibition on sexual proclivity evidence. The court held, "[T]his evidence runs afoul of Utah Rule of Evidence 412, if [Martin]'s argument is that because Ms. Egan has willingly gotten into a car with a strange man

in the past, she has a certain sexual predisposition."

¶ 40 We have previously held that evidence of an alleged rape victim's past sexual activities with someone other than the accused "carr[ies] a presumption of unfair[ness]" due to its "unusual propensity to unfairly prejudice, inflame, or mislead the jury," and thus, "distort the deliberative process and skew a trial's outcome." *State v. Dibello*, 780 P.2d 1221, 1229 (Utah 1989); *see also State v. Johns*, 615 P.2d 1260, 1264 (Utah 1980). In line with this presumption, Utah Rule of Evidence 412 provides both substantive and procedural restraints against the introduction of evidence concerning an alleged victim's past sexual acts. *See* Utah R. Evid. 412. Specifically, rule 412 prohibits in all criminal proceedings the introduction of evidence offered either (1) "to prove that any alleged victim engaged in other sexual behavior" or (2) "to prove any alleged victim's sexual predisposition." Utah R. Evid. 412(a).[5]

¶ 41 In the case now before us, the trial court excluded the newly discovered evidence concerning Egan's acceptance of a ride from a stranger in September 1996 based on the assumption that Martin was offering the evidence to prove that "because ... Egan ha[d] willingly gotten into a car with a strange man in the past, she has a certain sexual predisposition." Despite this reasoning, Martin argued both below and on appeal that he is "not seeking to admit into evidence any information concerning Egan's sexual behavior or predisposition." Rather, Martin avers that he wishes to introduce the evidence for the limited purpose of demonstrating Egan's "casual attitude toward strangers," her "impulsiveness," and her "irresponsibility." Indeed, the trial court itself admitted that Martin did not intend to introduce evidence of Egan's past sexual behavior. In its order denying Martin's motion for a new trial, the court reasoned:

> [T]he State argues that any evidence concerning the prior rape is inadmissible under Utah Rule of Evidence 412. This ar-

gument is moot because ... the defense [previously] clarified it would not seek to introduce any evidence of Ms. Egan's prior sexual activity, including the prior rape. Instead, the defense is seeking solely to introduce evidence of Ms. Egan's willingness to meet and travel with a stranger under very similar circumstances to [this] case.

Importantly, however, the lower court's determination in this regard—that any objection to the newly discovered evidence on the basis of rule 412's prohibition against evidence of an "alleged victim's sexual behavior" is moot in this case—must likewise apply to the rule's prohibition on evidence of an "alleged victim's sexual predisposition" as it applies here. *Id.*

¶ 42 Although rule 412 precludes evidence that "directly refer[s] to sexual activities or thoughts" as well as evidence that "*may* have a sexual connotation for the fact finder," the evidence of Egan's accepting a ride from a stranger in September 1996 simply possesses no sexual connotation, insinuation, or overtone. Utah R. Evid. 412 advisory committee note (emphasis added). Rather, given Martin's averment that he will not introduce "any evidence concerning Egan's sexual behavior or predisposition," including the alleged prior rape, a jury could no more reasonably deduce that Egan engaged in—or was forced to engage in—sexual acts with the stranger than it could conclude they played board games, built model airplanes, or ate sandwiches. While we acknowledge that rule 412 should be construed broadly in order to fully effectuate the policy considerations underlying its prohibitions, we refuse to extend the rule's circumference of influence to evidence as sexually innocuous as that at issue here. *See id.* Such a result would both impermissibly contradict the purpose of the rule itself and endanger the delicately balanced scope and effect of this jurisdiction's other evidentiary rules. *See, e.g., State v. Vargas*, 2001 UT 5, ¶ 31, 20 P.3d 271 ("When interpreting an evidentiary rule, we apply principles of statu-

---

5. However, such evidence becomes admissible if it satisfies the requirements of one of rule 412's specifically enumerated exceptions, the procedural requirements of that rule, and the other strictures of admissibility imposed by the Utah Rules of Evidence generally. *See* Utah R. Evid. 412.

tory construction."); *Butler v. Naylor,* 1999 UT 85, ¶ 9, 987 P.2d 41 (same); *State v. Rimmasch,* 775 P.2d 388, 396–99 (Utah 1989) (noting the careful balance among certain evidentiary rules); *State v. Tanner,* 675 P.2d 539, 554 (Utah 1983) (Stewart, J., dissenting) (same). Moreover, we note that to the degree information concerning Egan's sexual behavior or predisposition might somehow become implicated by the introduction of evidence concerning her acceptance of a ride from a stranger in September 1996, nothing in rule 412 would prevent the trial court from carefully directing the scope of questioning away from such inadmissible information or from issuing a limiting instruction to ensure that evidence prohibited by rule 412 is not considered by the jury as a general matter. *See* Utah R. Evid. 412; *see also, e.g., State v. Gardner,* 789 P.2d 273, 281 (Utah 1989) (noting that trial courts may properly protect interests of a witness by limiting scope of questioning to exclude inadmissible evidence); *State v. Watts,* 639 P.2d 158, 161 (Utah 1981) (same).

¶ 43 Consequently, we hold that the trial court erred by deeming inadmissible the newly discovered evidence at issue here as violating rule 412's prohibition on sexual proclivity evidence. Therefore, in accordance with our determination that the evidence is relevant and would not have constituted impermissible character propensity evidence at trial, we further hold that the court erred in reaching its ultimate conclusion that the evidence was inadmissible. *See supra* ¶¶ 34, 38.

## II. NEW TRIAL

¶ 44 Having determined that the evidence concerning Egan's acceptance of a ride from a stranger in September 1996 would have been admissible at Martin's trial, we now turn to the question of whether the trial court properly denied Martin's motion for a new trial.

¶ 45 "When reviewing a trial court's denial of a motion for a new trial, we will not reverse 'absent a clear abuse of discretion by the trial court.'" *State v. Colwell,* 2000 UT 8, ¶ 12, 994 P.2d 177 (quoting *State v. Harmon,* 956 P.2d 262, 265–66 (Utah 1998)); *see also State v. Bisner,* 2001 UT 99,

¶ 31, 37 P.3d 1073; *State v. Thomas,* 830 P.2d 243, 245 (Utah 1992). At the same time, however, we review the legal standards applied by the trial court in denying the motion for correctness. *Bisner,* 2001 UT 99 at ¶ 31, 37 P.3d 1073; *see also State v. Bakalov,* 1999 UT 45, ¶ 28, 979 P.2d 799. The legal standard to be applied when considering a motion for a new trial based on newly discovered evidence is threefold: In order to constitute grounds for a new trial, the evidence must

> "(1) . . . be such as could not with reasonable diligence have been discovered and produced at the trial; (2) . . . not be merely cumulative; [and] (3) . . . be such as to render a different result probable on the retrial of the case."

*State v. James,* 819 P.2d 781, 793 (Utah 1991) (quoting *State v. Gellatly,* 22 Utah 2d 149, 153, 449 P.2d 993, 996 (1969)); *see also Martin I,* 1999 UT 72 at ¶ 5, 984 P.2d 975.

¶ 46 In this case, it is entirely clear that the newly discovered evidence satisfies the first two prongs of the *James* test. *See Martin I,* 1999 UT 72 at ¶ 17, 984 P.2d 975. *James* first requires that the newly discovered evidence could not "have been discovered and produced" at trial with reasonable diligence on the defendant's part. 819 P.2d at 793; *see also Martin I,* 1999 UT 72 at ¶ 5, 984 P.2d 975. Here, Martin actually sought prior to trial to discover information related to the September 1996 incident, but was precluded from doing so by the trial court. *See id.* at ¶ 12. In *Martin I,* we held that the lower court had erred by limiting discovery in this manner, and we therefore remanded to "allow Martin the opportunity to search for new admissible evidence." *Id.* at ¶ 16. As a result, Martin could not have "discovered and produced" at trial the evidence concerning the September 1996 incident, since it was the trial court's own erroneous decision that precluded him from discovering that information in the first place. *James,* 819 P.2d at 793; *Martin I,* 1999 UT 72 at ¶¶ 12–17, 984 P.2d 975; *cf. State v. Carter,* 888 P.2d 629, 639–40 (Utah 1995); *State v. Williams,* 712 P.2d 220, 222–23 (Utah 1985). Likewise, we conclude that the newly discovered evidence concerning Egan's acceptance

of a ride from a stranger satisfies *James's* second requirement that the evidence "not be merely cumulative." 819 P.2d at 793. A careful review of the record indicates that no evidence was introduced at trial to rebut the testimony of Egan's sister that Egan is a dependable, reasonable, and responsible individual. Thus, the evidence at issue here is not "merely cumulative," but is novel. *Id.*; *cf. State v. Jiron*, 27 Utah 2d 21, 24, 492 P.2d 983, 985 (1972).

¶ 47 As a result, if the evidence concerning Egan's acceptance of a ride from a stranger in September 1996 is sufficient "to render a different result probable on the retrial of the case," then we must grant Martin a new trial. *James*, 819 P.2d at 793; *see also Martin I*, 1999 UT 72 at ¶ 17, 984 P.2d 975 ("[If] there is a reasonable likelihood that the new evidence would lead a jury to an outcome more favorable to Martin ... and if the other factors laid out in *James* are present, as they appear to be, a new trial must be granted."). Viewing the evidence in light of this standard, we conclude that Martin is due a new trial in this case.

¶ 48 In denying Martin's motion for a new trial, the lower court determined that the third prong of the *James* standard had not been satisfied because the newly discovered evidence was too "insignificant given the totality of the evidence against the defendant and the fact that the focus of the prosecution's case was not simply on how the parties met, but that Ms. Egan was set to other tasks when she was taken at gunpoint by the defendant." However, despite the lower court's characterization of the new evidence as "insignificant" due to the "totality of the evidence" against Martin, a review of the trial record reveals that the only direct evidence lodged against Martin was the testimony of Egan. The State introduced no physical evidence corroborating Egan's version of the events, and Martin's testimony uniformly contradicted Egan's account on the only relevant question at trial: consent. Indeed, we stated in *Martin I* that the "central issue" in the case was the credibility of the parties and whom "to believe about the circumstances of th[e] sexual contact." *Id.* at ¶ 16. Similarly, even the State conceded at trial that the

question of whether to convict Martin hinged entirely on "how [Egan and Martin] met and who you believe on how they met." As a result, any newly discovered evidence that could reasonably impact a jury's assessment on this issue—by either discrediting Egan or by making Martin's story more credible—is sufficient to make likely "an outcome more favorable to Martin," and thus, require a new trial. *Id.* at ¶ 17; *see also State v. Hoffhine*, 2001 UT 4, ¶¶ 27–28, 20 P.3d 265 (holding that a new trial is proper only where the evidence is sufficient "to render a different result probable on retrial"); *State v. Loose*, 2000 UT 11, ¶ 18, 994 P.2d 1237 (same); *State v. Goddard*, 871 P.2d 540, 545 (Utah 1994) (same); *State v. Swain*, 541 P.2d 5, 6 (Utah 1975) (same).

¶ 49 Here, the newly discovered evidence possesses a reasonable likelihood of both discrediting Egan's testimony and making Martin's version of the events more credible. At trial, the State urged the jury to accept Egan's account of what happened as the version that comported with "common sense" and was "reasonable" because Egan had gone to the store to "pick up a last-minute item" for her family's dinner, and it would be unreasonable to believe that she abandoned her plans in this regard to go on a ride with a stranger. To support this assertion, the State offered the testimony of Egan's sister that it was "surprising" Egan did not return home immediately because she is responsible and dependable and "isn't like that." Likewise, the State asserted that Martin's account of what happened was "unreasonable" and "difficult to swallow" because it was premised on the notion that Egan would willingly enter Martin's vehicle despite the fact that they had just met. Importantly, however, the evidence discovered by Martin on remand directly contradicts the State's theory of the case and supports his own. The evidence impugns the testimony of Egan's sister that Egan is a responsible person by showing that Egan has been irresponsible enough in the past to enter a stranger's car and immediately exchange personal information, and it similarly refutes the State's contention that "common sense" dictates Egan would not enter Martin's vehicle here. Indeed, the newly discovered evidence un-

dercuts the State's assertion that Martin's version of the story is "difficult to swallow" by making his account more probable given Egan's prior acceptance of a ride from a stranger. *See supra* ¶¶ 32, 34, 38. Accordingly, in recognition of the crucial role of credibility to this case—and in view of the far-reaching impact the newly discovered evidence could have on a jury's determination of that issue—we hold that the trial court erroneously concluded the evidence was too "insignificant" to constitute grounds for a new trial. The newly discovered evidence is not only material and relevant to the "central issue" of the case, but, if accepted as such by the jury, may constitute the difference between conviction and acquittal. *Martin I,* 1999 UT 72 at ¶ 16, 984 P.2d 975; *see also City of Hildale v. Cooke,* 2001 UT 56, ¶¶ 33–34, 28 P.3d 697; *Swain,* 541 P.2d at 6; *State v. Halford,* 17 Utah 475, 483, 54 P. 819, 821 (1898).

¶ 50 Therefore, in concert with our prior determinations that the evidence would have been admissible at trial and that it properly satisfies the first two requirements of *James,* we reverse the trial court's order denying Martin's motion and remand for a new trial. *See James,* 819 P.2d at 793; *see also City of Hildale,* 2001 UT 56 at ¶¶ 33–34, 28 P.3d 697; *Halford,* 17 Utah at 483, 54 P. at 821.

### CONCLUSION

¶ 51 We conclude that the trial court erred by deeming the newly discovered evidence at issue here inadmissible as irrelevant, as improper character propensity evidence, and as impermissible sexual proclivity evidence. Had Martin possessed the evidence at trial, it would have been admissible to rebut the testimony of Egan's sister, and thus, to attempt to establish Martin's testimony as more credible than Egan's. We further hold that the trial court erroneously ruled that the evidence does not satisfy the *James* standard for granting a new trial based on newly discovered evidence. The evidence discovered by Martin on remand could not have been reasonably discovered previously, is not merely cumulative, and possesses a reasonable likelihood of rendering an outcome more favorable to Martin on retrial. Accordingly,

we reverse the decision of the trial court and remand for a new trial in a manner consistent with this opinion.

¶ 52 Justice DURHAM and Justice DURRANT, concur in Associate Chief Justice Russon's opinion.

WILKINS, Justice, dissenting:

¶ 53 I respectfully dissent. While I concur with the lead opinion that the evidence regarding the victim's past acceptance of a ride to school is not prohibited by rule 412, I find it both to be of marginal relevance at best and unlikely to produce a different result on retrial. I would not reverse the trial court on that basis.

¶ 54 As eloquently described in the lead opinion, at issue is evidence regarding an incident when the victim accepted a ride to school from a stranger. The lead opinion finds this evidence to be particularly telling regarding the dispute between the victim and the defendant as to how it came to be that the victim ended up in the defendant's truck. I see the circumstances as substantially different: Accepting a ride when without a car and on the way to school, as contrasted to accepting an invitation for a ride when not only already sitting in her own car, but clearly on an errand for her family.

¶ 55 The trial court, in considering the motion for new trial, was required to find, inter alia, that the new evidence proposed would "not be merely cumulative; [and] ... be such as to render a different result probable on the retrial of the case" under our standard in *State v. James,* 819 P.2d 781, 793 (Utah 1991). The lead opinion sees the proposed evidence as satisfying both of these requirements, while I do not.

¶ 56 In this case the jury had heard testimony from the victim and the defendant, each relating markedly different versions of the events. The differences between those versions were a central feature of the arguments made by counsel to the jury, and constituted a pivotal question faced by the jury in finding the defendant guilty of kidnaping and sexually assaulting the victim. The defendant's position throughout was that the victim was not truthfully recounting the

circumstances under which they ended up in defendant's truck for the sexual encounter. Defendant argues, and the lead opinion agrees, that the victim's acceptance of a ride from a stranger three months prior to the incident in question here somehow demonstrates so strongly that the victim is lying about the incident with the defendant that it will *probably* result in an acquittal on retrial.

¶ 57 This court has consistently noted that on appeal, we review the record facts in a light most favorable to the jury's verdict, and we present conflicting evidence only as necessary to understand issues raised on appeal. *E.g., State v. Holgate,* 2000 UT 74, ¶ 2, 10 P.3d 346; *State v. Dunn,* 850 P.2d 1201, 1205–06 (Utah 1993); *see also, e.g., State v. Evans,* 2001 UT 22, ¶ 2, 20 P.3d 888; *State v. Vargas,* 2001 UT 5, ¶ 2, 20 P.3d 271; *State v. Brown,* 948 P.2d 337, 339 (Utah 1997). The following facts were also admitted at trial and before the trial judge in considering whether to grant a new trial. They are worthy of recitation and should be considered with the newly discovered evidence. In my view, they demonstrate that the evidence— both the newly discovered evidence and the already admitted evidence, considered as a whole—was not such that a different result was probable or reasonably likely on retrial.

¶ 58 Egan's mother, Stephanie White, testified that when Egan arrived home she "loud[ly] pound[ed] on the door," startling White and White's other daughter, Sophia Adams, who were in the living room watching television. White opened the door and testified that Egan "just stood there. She was shaking; she was hysterical; she was crying, and I had to lead her into the house." White further testified that she and Adams "sat [Egan] on the couch, and we tried talk to her to find out why she was so hysterical." White testified that Egan continued to shake and cry as she sat on the couch and explained that a man with a gun had raped her. Adams also testified that Egan pounded on the door, was visibly shaking and crying, and was very upset. Adams testified that "[Egan] said that a man with a gun had taken her and raped her."

¶ 59 White called 911 and took Egan to a local hospital where she was examined. Although no physical injuries were uncovered, the examining nurse testified that "[Egan] was tearful and emotionally distraught," throughout the exam. The nurse testified that Egan was "really closed off, really afraid to be touched, ... having a hard time answering questions, [and having a] hard time coping with the examination." Given these additional facts which were admitted at trial, considered in the light most favorable to the jury's verdict, the evidence before the jury was such that a different result is not reasonably likely or probable on retrial.

¶ 60 In my view the standard of review for a trial court's denial of a new trial also supports affirmance. As noted by the lead opinion, when we review "a trial court's denial of a motion for a new trial, we will not reverse 'absent a clear abuse of discretion by the trial court.'" *Supra* ¶ 45 (quoting *State v. Colwell,* 2000 UT 8, ¶ 12, 994 P.2d 177 (quoting *State v. Harmon,* 956 P.2d 262, 265– 66 (Utah 1998))). The lead opinion goes on to correctly note, "we review the legal standards applied by the trial court in denying the motion for correctness." *Supra* ¶ 45 (citing, inter alia, *State v. Bisner,* 2001 UT 99, ¶ 31, 37 P.3d 1073). The trial court was correct to apply the three-criteria standard articulated in *State v. James,* 819 P.2d 781, 793 (Utah 1991). The application of the three-part standard to the facts, however, is then reviewed under an abuse of discretion standard. *See, e.g., State v. James,* 819 P.2d 781, 793 (Utah 1991) ("Trial judges are given a wide range of discretion in determining whether newly discovered evidence or errors which occurred within a trial merit the grant of a new trial."). We grant the trial court discretion in deciding whether to grant a new trial out of recognition of the position of the trial court to give proper weight to and evaluate the credibility of the evidence presented. The trial court is in a far better position than we are as an appellate court to gauge credibility, give weight to the evidence presented, and determine whether, if the newly discovered evidence were presented at a new trial alongside the already admitted evidence, the evidence is such that a different result is probable.

¶ 61 Moreover, because the newly discovered evidence would be used as impeachment evidence to contradict Egan's sister's testimony about Egan's dependability, and not as evidence of Egan's sexual proclivity or disposition, a new trial should not be granted in this case. Absent truly exceptional circumstances, newly discovered impeachment evidence does not ordinarily warrant a new trial. *See State v. Worthen,* 765 P.2d 839, 851 (Utah 1988) (citing, inter alia, *State v. Brown,* 48 Utah 279, 288, 159 P. 545, 549 (1916) (Frick, J., dissenting)).

¶ 62 In this case, because the trial court was correct in using the *James* standard, the question is whether the trial court abused its discretion in determining that a different result was not probable on retrial. The trial judge, who also heard and saw all of the testimony of the parties, and to whom is assigned the task of determining the likelihood that a different result is probable on retrial, saw the new evidence as not relevant to the charge on trial—whether Egan consented to sexual activity with Martin—and not likely to render a different result for the defendant on retrial. I simply see no clear abuse of discretion in this case. I would defer to the better informed decision of the trial court, and would therefore affirm the denial of the motion for new trial.

¶ 63 Chief Justice HOWE concurs in Justice WILKINS' dissenting opinion.